**MEDIA RANCH, INC., Plaintiff,**

v.

**MANHATTAN CABLE TELEVISION, INC., Defendant.**

**No. 90 Civ. 7218 (LBS).**

United States District Court, S.D. New York.

Feb. 26, 1991.

Norwick & Schad, New York City (Kenneth P. Norwick, of counsel), for plaintiff.

Cravath, Swaine & Moore, New York City (Stuart W. Gold, Jennifer L. Leuba, Timothy J. Coleman, of counsel), for defendant.

## OPINION

SAND, District Judge.

This case raises questions of first impression regarding the meaning of § 612 of the Cable Communications Policy Act of 1984 ("Cable Act"), 47 U.S.C. § 532 (1984). The plaintiff, Media Ranch, Inc. ("Media"), is the producer of an adult-oriented cable television program called "Midnight Blue." The defendant, Manhattan Cable Television, Inc. ("MCTV"), is a subsidiary of Time Warner, Inc. MCTV operates a cable television system that serves much of Manhattan.

In this action, Media seeks relief under § 612 of the Cable Act on the ground that MCTV has set unreasonable terms and conditions for the continued broadcast of "Midnight Blue." Presently before this Court are two motions: MCTV's motion for summary judgment or, in the alternative, a protective order; and Media's motion for a

declaration that MCTV has not set aside the number of leased access channels required by the Cable Act. For the reasons given below, MCTV's motion for summary judgment is denied. This Court reserves decision on MCTV's request for a protective order. Media's motion for a declaration that MCTV has not set aside the proper number of leased access channels is granted.

## I. BACKGROUND

Pursuant to a franchise agreement with the City of New York, MCTV operates a cable television system with forty-two activated channels which reaches over 250,000 households and numerous hotels, restaurants and bars in Manhattan. MCTV is currently in the process of completing a service upgrade. Customers in the upgraded areas receive all forty-two activated channels, while those in the areas not yet upgraded receive only thirty-eight channels.

For more than ten years, Media has produced a television show entitled "Midnight Blue." The show is a magazine-type program hosted by Media's president, Al Goldstein. "Midnight Blue" presents news, features and commentaries on various sexual and nonsexual themes. It regularly features sexually explicit material, such as nude dancing, and carries commercials advertising adult-oriented services including phone lines for sexually oriented conversations and escort services.

From 1980 until October 1, 1990, "Midnight Blue" was broadcast on cable Channel 23.[1] In August, 1990, MCTV decided to devote Channel 23 entirely to C–SPAN programming. By letter dated August 14, 1990, MCTV informed Media and the other independent programmers who were using Channel 23 that it would no longer be available to them after October 1st. See Ex. 1 to Affidavit of Fred Ciccone (12/20/90). However, the letter explained that the programmers could seek time on either the public access or leased access channels which MCTV had established.

The public access and leased access channels referred to in the letter were established by MCTV in an attempt to comply with the requirements of the Cable Act and the terms of its franchise agreement with the City of New York.[2] MCTV designated Channels 16 and 17 as public access channels on which time is available to the public free of charge on a first-come, first-served basis. No commercials are permitted on those channels. Channels 26, 35, 40 and 43 were set aside for leased access use by unaffiliated commercial programmers.[3] Commercials are permitted on the leased access channels.

Programmers may obtain time on the leased access channels by negotiating individual contracts with MCTV. Currently, two of the leased-access channels—Channels 40 and 43—are leased in their entirety to the "Prevue Guide" and the "Nashville Network," respectively. Channel 26 is also fully committed, with the exception of three hours during the week, to the "Home Shopping Network." Thus independent programmers seeking broadcast time are essentially limited to applying for time on Channel 35.

During the fall of 1990, MCTV negotiated contracts with a number of independent programmers for time on Channel 35. The shows produced by these programmers are

---

**1.** Channel 23 was an experimental "public leased" channel established pursuant to a 1970 franchise agreement between New York City and Sterling Information Services, MCTV's predecessor in interest. Independent programmers were offered time on Channel 23 on a first-come, first-served basis at prices ranging from $65.60 to $200 per hour. See Affidavit of Fred Ciccone (12/20/90), ¶ 5.

**2.** Section 611 of the Cable Act permits municipalities to require cable operators receiving a franchise to set aside channels for public, edu-

cational or government use. See 47 U.S.C. § 531 (1984). MCTV's franchise agreement with New York City requires it to set aside two public use channels.

Section 612 of the Cable Act requires cable operators to set aside a certain percentage of their channels for leased access use by commercial programmers. See 47 U.S.C. § 532 and discussion at pp. 313–314, infra.

**3.** In non-upgraded areas, customers receive only Channels 26 and 35. Customers in upgraded areas receive all four leased access channels.

diverse, covering a variety of topics and appealing to a variety of audiences. *See* Affidavit of Clarence Grier (12/20/90), ¶ 3. Ten of the programmers allotted time on Channel 35 are "adult" programmers whose shows contain nudity and sexually explicit language.

On September 10, 1990, Media applied to MCTV for commercial use time on the leased access channels. Media and MCTV negotiated for approximately six weeks before reaching impasse. During this negotiation period, MCTV continued to broadcast "Midnight Blue," airing it on Channel 35 at its usual broadcast time of midnight on Mondays and Fridays.

On November 9, 1990, Media filed the complaint in this action, alleging that the price demanded by MCTV for time on Channel 35, and eight other non-monetary terms insisted upon by MCTV, were unreasonable within the meaning of § 612(d) of the Cable Act. Among the non-monetary terms objected to by Media are a provision limiting MCTV's liability for non-willful breach of contract and a provision requiring Media to submit a videotape of its programming to MCTV for review one week in advance of the broadcast date.[4] Media served its first discovery request upon filing the complaint. That request sought, among other things, information on MCTV's costs and profits from operating its cable system.

On December 5, 1990, the parties entered into a stipulation establishing a motion schedule and staying discovery. The stipulation also provided that MCTV would continue to broadcast "Midnight Blue" during the pendency of this action. MCTV's motion for summary judgment and Media's motion for a declaration regarding MCTV's compliance with the set aside requirements of § 612(b) were filed in late December,

1990. Oral argument on both motions was heard on January 24, 1991.

## II.  DISCUSSION

The two motions presently before this Court raise novel questions concerning the meaning and application of Section 612 of the Cable Act, 47 U.S.C. § 532. Consequently, it is appropriate to begin with a brief discussion of Section 612 and its legislative history.

### A.  *Section 612 of the Cable Act*

Prior to 1984, the cable television industry had been governed by a patchwork of federal, state and local regulations. Congress passed the Cable Act to establish a national policy governing the cable industry and to establish the primacy of federal regulation of cable. *See* H.R.Rep. No. 934, 98th Cong., 2d Sess. 19 (1984) (hereinafter "H.R.Rep."), *reprinted in* 1984 U.S.Code Cong. & Admin.News 4655, 4677; D. Lampert, *Cable Television: Does Leased Access Mean Least Access?* (hereinafter *"Leased Access"*), in *Cable Television Leased Access* 3, 6 (Annenberg Washington Program in Communications Policy Studies, 1991). In passing the Cable Act, Congress sought to promote two primary goals: to encourage the growth and development of the cable industry, and to assure that cable companies provide the widest possible diversity of programming to the communities they serve. *See* H.R.Rep. at 19, 40, 1984 U.S.Code Cong. & Admin.News at 4656, 4677. The Act addresses the goal of diversity primarily through § 611, which establishes public access requirements, and § 612, which establishes the so-called "leased access" requirements.

Subsection (b) of § 612 requires cable operators to designate a certain percentage of their channel capacity for commercial use by programmers not affiliated with the operator.[5] 47 U.S.C. § 532(b). Subsection

---

**4.** This prior review provision has been challenged by Media in a separate action currently pending before this Court, *Al Goldstein and Media Ranch, Inc. v. Manhattan Cable Television,* 90 Civ. 4750 (LBS).

**5.** The percentage of channels to be set aside varies depending on the number of "activated

channels" in the cable system. Thus, an operator with more than 36 but less than 54 activated channels (the category into which MCTV falls) must set aside for leased access use ten percent of its activated channels "which are not otherwise required for use ... by Federal law or regulation." 47 U.S.C. § 532(b)(1)(A). Operators with more than 100 activated channels

(c) permits cable operators to set the price and other conditions upon which they will offer leased access time to independent programmers. 47 U.S.C. § 532(c). However, subsection (d) subjects the operator's power to set prices and conditions to a standard of reasonableness and permits programmers aggrieved by the operator's actions to bring suit in federal court. 47 U.S.C. § 532(d). In such actions, the price and conditions offered by the operator are presumed to be reasonable and in good faith. The plaintiff must overcome that presumption by clear and convincing evidence. *See* 47 U.S.C. § 532(f).

The purpose of § 612, as enunciated in the text of the section itself and reiterated in the legislative history, is to "assure that the widest possible diversity of information sources are made available to the public from cable systems in a manner consistent with growth and development of cable systems." 47 U.S.C. § 532(a); *see also* H.R. Rep. at 47, 1984 U.S.Code Cong. & Admin. News at 4684. Congress was concerned that cable operators might be inclined to broadcast only programming produced by themselves or their affiliates—over which they would have editorial control—thereby limiting the information sources available to the public. *See id.* at 48, 1984 U.S.Code Cong. & Admin.News at 4685. To prevent this result, Congress required large cable operators to reserve some channels for use by independent commercial programmers.

The intention of Congress in enacting § 612 was to address the problem of editorial control, not market power. *See id.* at 50, 1984 U.S.Code Cong. & Admin.News at 4687. The price and conditions on which leased access cable time is offered are left to the marketplace, to be determined through negotiations between the cable operator and the independent programmer. Nevertheless, Congress realized that market power and editorial control are not entirely separable. A cable operator

> could frustrate the intent of [§ 612] ... by establishing price, terms and condi-

must set aside fifteen percent of their channel capacity for leased access use. *See* 47 U.S.C.

> tions which provide financial disincentives for third party programmers to offer cable services.

*Id.* Thus Congress subjected the prices and conditions offered by cable operators to a standard of reasonableness, in order to ensure that the rates and terms offered by cable operators would be fashioned "to encourage, and not discourage, use of [leased access] channels." *Id.* at 51, 1984 U.S. Code Cong. & Admin.News at 4688.

To enforce the reasonableness standard, Congress provided a right of action in federal court to persons denied leased access time or offered time on unreasonable terms and conditions. *See* 47 U.S.C. § 532(d); H.R.Rep. at 52–53, 1984 U.S.Code Cong. & Admin.News at 4689–90. Congress envisioned the development of federal case law on the reasonableness issue which would provide guidance to cable operators and programmers in their negotiations. *See id.* at 52, 1984 U.S.Code Cong. & Admin.News at 4689.

B. *MCTV's Motion for Summary Judgment*

Having reviewed the language and legislative history of § 612, this Court now turns to MCTV's summary judgment motion. Summary judgment may be granted where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* F.R.Civ.P. 56(c). In ruling upon a motion for summary judgment, all inferences are drawn in favor of the non-moving party. However, "the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Thus in deciding whether a *genuine* dispute exists as to a material fact, courts must decide whether the evidence proffered is such that a reasonable finder of fact could decide against the moving party in light of the applicable evidentiary standard.

§ 532(b)(1)(C).

In this case, MCTV asserts that there is no genuine issue of fact as to the reasonableness of the price and other conditions it has offered to Media for leased access time. MCTV argues that the policy underlying § 612 is that cable television subscribers should receive a diverse selection of programming. So long as there is a diversity of programs on an operator's leased access channels, MCTV maintains, the terms and conditions being offered by the operator must, as a matter of law, be reasonable. MCTV urges that in this case, the affidavits it has submitted demonstrate that a diversity of programming exists on its four leased access channels. *See* Affidavit of Clarence Grier (12/20/90), ¶¶ 3–4. Therefore, MCTV argues, the statutory mission is being fulfilled and there can be no genuine dispute as to the "reasonableness" of MCTV's prices and conditions.

This Court believes that MCTV's argument misinterprets § 612 by confusing the goal of the statute with the means set out in the statute for accomplishing that goal. The policy goal of § 612 is to promote a diversity of programming. The means chosen by Congress to implement that goal is the requirement that cable operators establish reasonable prices and conditions for leased access broadcasting. The dispositive fact issue on this motion for summary judgment is whether MCTV is complying with the statute—that is, whether the prices and conditions offered to Media by MCTV are reasonable. A showing that the policy goals underlying the statute are being met may be evidence of reasonableness but it is not, as MCTV suggests, conclusive proof of reasonableness.

■ The language of § 612 and its legislative history support the conclusion that reasonableness, and not diversity, is the determinative issue in § 612 suits. Section 612(d) provides that a federal district court may provide relief to a plaintiff if the court "finds that the price, terms, or conditions established by the cable operator are un-

reasonable." 47 U.S.C. § 532(d). The legislative history of § 612 specifically envisions the development of federal case law on the reasonableness issue. *See* H.R.Rep. at 52, 1984 U.S.Code Cong. & Admin.News at 4689. Thus it is clear that Congress intended for the federal courts to intervene where the terms and conditions offered by the cable operator are unreasonable, and not only where the statutory goal of diversity is not being met.[6]

Contrary to MCTV's assertions, the existence of the statutory presumption of reasonableness does not change this analysis. The presumption is relevant to MCTV's summary judgment motion only insofar as it establishes the "prism", *see Anderson*, 477 U.S. at 254, 106 S.Ct. at 2513, through which this Court must look in determining if a *genuine* dispute exists as to a material fact. The presumption in no way influences the determination of what the material facts in a § 612 case are.

In the instant case, then, the dispositive fact question for summary judgment purposes is whether the rates and non-monetary terms offered to Media by MCTV are reasonable. Summary judgment can be granted to MCTV only if the evidence proffered by the parties is such that no reasonable fact-finder could determine by clear and convincing evidence that the prices and terms offered by MCTV are unreasonable.

■ Applying the standard set forth above to the present case, this Court holds that MCTV is not entitled to summary judgment at this stage of the proceedings. Despite the fact that it has not yet obtained any discovery, Media has produced, in the form of affidavits, some evidence that the price and terms offered to it by MCTV are unreasonable. Specifically, Media has proffered evidence that MCTV's last price offer before impasse was more than two times the amount Media had paid for time on Channel 23. *See* Affidavit of Philip Eisenberg (1/10/91) (hereinafter "Eisen-

---

6. Section 612 goes on to state that if a Court determines that the price set by the cable operator is unreasonable, the Court itself shall set a reasonable rate. *See* 47 U.S.C. § 532(d). We express no opinion at this time as to whether the setting of a reasonable rate is a function properly delegable to an Article III court. *Cf. Keller v. Potomac Elec. Power Co.,* 261 U.S. 428, 441–44, 43 S.Ct. 445, 448–49, 67 L.Ed. 731 (1923).

berg aff."), ¶¶ 3, 7–8; *see also* Transcript of Oral Argument (1/24/91) (hereinafter "tr."), p. 10. With regard to non-price terms, Media has proffered evidence of a very broad exculpation clause in MCTV's proposed contract which, Media asserts, would be unconscionable under New York law. *See* Ex. A to Eisenberg aff., p. 25; *see also* tr. at 30–31, 50. It may be that Media's evidence falls short of establishing by clear and convincing evidence that MCTV has acted unreasonably. However, on the basis of the current record, which is necessarily incomplete due to the lack of discovery, this Court cannot say that no reasonable finder of fact could find for Media on the question of reasonableness. Accordingly, MCTV's motion for summary judgment is denied.

MCTV argues that by permitting Media to bring a § 612 action despite the existence of significant diversity on MCTV's leased access channels, this Court will open the floodgates to numerous other programmers who will turn to the Court as a rate-making body for cable television contracts. The short answer to this argument is that whether the number of such suits will be great or few was a consideration for Congress and would not furnish a basis for this Court to abstain from adjudication. In any event, this Court does not believe that § 612(d) will spawn a substantial number of lawsuits. For small, independent programming companies, the cost of federal court litigation is likely to dwarf the potential returns of a § 612 action in most instances. As § 612 actions are decided by the courts, a body of precedent defining the bounds of reasonableness will develop and the need for litigation will be reduced. Finally, Rule 11 sanctions will serve to deter vexatious lawsuits by disgruntled programmers.

To summarize, this Court holds that the relevant factual inquiry in § 612 actions is whether the terms and conditions offered by a cable operator are reasonable. In this case, Media has adduced evidence that some of the terms of MCTV's final offer to it were unreasonable. Because a genuine factual dispute exists as to the reasonableness issue, MCTV's motion for summary judgment must be denied.

■ In its motion papers, MCTV requested that this Court enter a protective order limiting discovery of its cost and profit data in the event that its summary judgment motion was denied. As indicated at oral argument, *see* tr. at 41, this Court will defer decision on MCTV's request in order to give the parties an opportunity to consult with a view towards reaching agreement as to the appropriate extent of discovery.

### C. Media's Motion for a Declaration Regarding the § 612 Set Aside Requirement

In its motion, Media seeks a declaration that MCTV has failed to set aside the number of leased access channels required by § 612(b), 47 U.S.C. § 532(b).[7] MCTV argues that Media lacks standing to challenge its compliance with § 612's set aside requirement, and that in any event it has set aside the number of channels required by the statute.

### 1. Standing

■ The determinative question on the standing issue is whether Media is a "person aggrieved" within the meaning of § 612(d) as to the issue of whether MCTV has set aside the appropriate number of leased access channels. Section 612(d) states:

Any person aggrieved by the failure or refusal of a cable operator to make channel capacity available for use pursuant to this section may bring an action in the district court of the United States for the judicial district in which the cable system is located to compel that such capacity be made available. If the court finds that the channel capacity sought by such per-

---

**7.** By stipulation dated December 5, 1990, the parties agreed that Media would make this motion. Media requests no specific relief against MCTV other than a declaration of this Court's determination. *See* Reply Affirmation In Support of Motion (1/22/91), ¶ 3. Media suggests that a ruling on this issue will contribute to the resolution of this case.

son has not been made available in accordance with this section, or finds that the price, terms, or conditions established by the cable operator are unreasonable, the court may order such system to make available to such person the channel capacity sought, and further determine the appropriate price, terms, or conditions for such use ... and may award actual damages....

47 U.S.C. § 532(d).

The term "person" was intended by Congress to refer to programmers who are either denied leased access time or offered such time on unreasonable terms and conditions. *See New York Citizens Comm. on Cable TV v. Manhattan Cable Television, Inc.*, 651 F.Supp. 802, 813–15 (S.D.N.Y. 1986) (citizens' group lacked standing to challenge MCTV's compliance with set aside requirement of § 612(b); "person" aggrieved refers to programmers); *see also* H.R.Rep. at 53, 1984 U.S.Code Cong. & Admin.News at 4690. Since Media is a programmer offered leased access time on allegedly unreasonable terms, it falls within the category of persons who may be "aggrieved" within the meaning of § 612(d).

MCTV asserts that, notwithstanding Media's status as a programmer, it is not "aggrieved" by MCTV's alleged failure to set aside the proper number of leased access channels. MCTV argues that because Media was offered time on Channel 35, it has not been injured by MCTV's alleged non-compliance with § 612(b). Media, for its part, argues that if a greater number of leased access channels was available, the terms and conditions offered it by MCTV might become more favorable by virtue of the principles of supply and demand. MCTV counters that it bases its § 612 pricing decisions primarily on the nature of the programmer and its ability to pay, and not on its cost for providing service or the number of programmers seeking access.

**8.** Indeed, Media's theory has particular force in the context of programmers of adult-oriented programmers like itself. MCTV's franchise agreement provides that sexually explicit programming may be broadcast only during a "safe

*See* Affidavit of Fred Ciccone (1/11/91), ¶¶ 2–4.

■ In deciding questions of standing, courts are required to accept a plaintiff's allegations as true and to construe those allegations in a manner favorable to the plaintiff. *See Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 109, 99 S.Ct. 1601, 1612, 60 L.Ed.2d 66 (1979); *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). Here, Media's contention that the availability of more leased access channels might affect the price and terms upon which MCTV offers time makes practical sense.[8] *Cf. Craig v. Boren*, 429 U.S. 190, 194–97, 97 S.Ct. 451, 455–56, 50 L.Ed.2d 397 (1976) (beer vendor had standing to challenge law providing lower drinking age for women than for men because law caused her economic injury by preventing sales to potential male customers). While Media has not submitted evidence refuting MCTV's contentions about its pricing policies, it must be borne in mind that no discovery has yet occurred in this case. Consequently, at this stage of the proceedings, this Court accepts Media's contention that the availability of a greater number of leased access channels would affect the conditions upon which MCTV offers leased access time, and also might affect the reasonableness of such offers. Accordingly, we hold that Media is a "person aggrieved" within the meaning of § 612(d) and may raise the claim that MCTV has not set aside the number of leased access channels required by § 612(b).

### 2. *Required Number of Leased Access Channels*

■ Having determined that Media has standing, the next issue is whether MCTV has set aside the number of leased access channels required by § 612(b). The parties agree that MCTV has forty-two activated

harbor" period between 12:00 a.m. and 4:30 a.m. Thus the supply of leased access time available to adult programmers is more limited than that available to other programmers.

channels and has set aside a total of four leased access channels.

Section 612(b)(1)(A) provides:

An operator of any cable system with 36 or more (but not more than 54) activated channels shall designate [for leased access use] 10 percent of such channels which are not otherwise required for use (or the use of which is not prohibited) by Federal law or regulation.

47 U.S.C. § 532(b)(1)(A). In making this computation, fractions are to be rounded up. *See* H.R.Rep. at 49, 1984 U.S.Code Cong. & Admin.News at 4686.

It is clear from the legislative history of § 612 that in providing for the deduction of channels "otherwise required," Congress had in mind the "must-carry" rules promulgated by the Federal Communications Commission ("FCC") that were in effect at the time the Cable Act was passed. These rules required cable operators to carry locally broadcast television stations on their systems. *See* 47 C.F.R. § 76.54(a) (1984). In 1985, the must-carry rules were invalidated on First Amendment grounds in *Quincy Cable TV, Inc. v. FCC*, 768 F.2d 1434, 1462 (D.C.Cir.1985), *cert. denied,* 476 U.S. 1169, 106 S.Ct. 2889, 90 L.Ed.2d 977 (1986). The FCC subsequently imposed modified must-carry rules. These new rules also were struck down by the D.C. Circuit. *See Century Communication Corp. v. FCC*, 835 F.2d 292, 304–05 (D.C. Cir.1987), *cert. denied,* 486 U.S. 1032, 108 S.Ct. 2014, 100 L.Ed.2d 602 (1988). The FCC apparently has no plans to reintroduce must-carry rules. *See Oversight of the 1984 Telecommunications Act: Hearings Before the Subcomm. on Communications of the Senate Comm. on Commerce, Science, and Transportation,* 101st Cong., 1st Sess. 354–56 (November 16–17, 1989) (statement of Alfred C. Sikes, Chairman of the FCC).

Since the must-carry rules are no longer in force, the number of leased access channels that MCTV is required to set aside by § 612 must be calculated on the basis of the forty-two activated channels MCTV possesses. Applying the calculation set forth in § 612(b), ten percent of 42 channels, or 4.2 channels, must be reserved for leased access use. Since fractions are to be rounded up, MCTV is required by § 612(b) to set aside five channels for leased access use.

MCTV urges that § 612(b) should not be read so literally, in light of the fact that a circumstance prominent in the collective mind of Congress when it drafted § 612(b)—the must-carry rules—no longer exist. MCTV argues that the intent of Congress was to permit a deduction for cable retransmission of local broadcast stations, and that the deduction therefore should be permitted even though cable operators are no longer required to carry these broadcasts. MCTV contends that because it continues to broadcast twelve local stations, that number should be deducted in the set aside calculation.[9]

When the terms of a statute are unambiguous, the statute should be applied literally unless to do so would produce a result clearly at odds with the intent of the drafters. *See Demarest v. Manspeaker,* — U.S. ——, 111 S.Ct. 599, 604, 112 L.Ed.2d 608 (1991). Here the statute, by its own terms, provides a deduction only for channels "required for use (or the use of which is not prohibited) by Federal law or regulation." 47 U.S.C. § 532(b)(1)(A). MCTV concedes that none of its forty-two activated channels is either required for other use or forbidden to be used by federal law. Thus, under the unambiguous terms of § 612(b), MCTV's set aside requirement is five channels.

This result is not "demonstrably at odds," *see Demarest,* 111 S.Ct. at 604, with the intent of Congress. The legislative history of § 612 indicates that Congress provided the deduction to avoid overburdening cable operators, who were already required to devote a significant number of their

---

**9.** In MCTV's view, the appropriate calculation is: 42 activated channels minus 12 local stations equals 30. Ten percent of 30 is 3. MCTV has set aside four channels, so under its theory it exceeds the requirements of § 612(b). *See* Defendant's Memorandum in Opposition (1/11/91), p. 19.

channels to the must-carry regime, a use deemed appropriate by the government. As a result of the demise of the must-carry rules, cable operators who continue to carry local broadcasts do so of their own free will, and, presumably, because it is in their own financial interest to do so. Such operators are burdened, if at all, by their own actions and not those of the government. Thus the intent of Congress in enacting § 612(b) will not be thwarted by the construction of that section in a manner consistent with its liberal terms. Indeed, this Court believes that our interpretation fosters the Congressional goal of ensuring a diversity of programming on cable systems.

To summarize, MCTV is required by § 612(b) to set aside five leased access channels. It has set aside only four such channels and therefore is in violation of § 612(b).

Media specified in its moving papers that its motion was in the nature of a motion *in limine,* and that it did not request any affirmative relief against MCTV at this time. Therefore, this Court will defer the question of remedy until a request is made by Media.

A final aspect of the matters presently before this Court is the existence of the upgraded and non-upgraded areas served by MCTV. The upgraded areas receive all 42 channels, including four leased access channels. The non-upgraded areas receive 38 channels, including two leased access channels. Media argues that § 612(b) requires MCTV to set aside at least two more channels in the non-upgraded areas.[10] Because this Court has deferred the question of remedy, we will not address Media's contention at this time. However, we note that because MCTV is in the process of providing all 42 channels to customers in the non-upgraded areas, the issue may resolve itself without the need for intervention by the Court.

**10.** In its motion papers, Media does not state clearly whether it believes that MCTV should be required to set aside five channels in the non-upgraded areas, or whether setting aside only

**CONCLUSION**

For the reasons given above, MCTV's motion for summary judgment is denied and decision is deferred on its alternative motion for a protective order. Media's motion for a declaration that MCTV has not set aside the number of leased access channels required by § 612(b) of the Cable Act, 47 U.S.C. § 532(b), is granted. The question of remedy as to MCTV's violation of § 612(b) is deferred. The parties are to advise the Court within fifteen days whether they have resolved the questions related to the scope of discovery or whether they wish the Court to decide the pending motion for a protective order.

SO ORDERED.

four might comply with § 612(b) due to the fact that only 38 channels are available in those areas. *See* Plaintiff's Memorandum of Law in Support of Its Motion (12/21/90), p. 6.