SIERRA EAST TELEVISION,
INC., Plaintiff,

v.

WESTSTAR CABLE TELEVISION,
INC., Defendant.

And Related Counterclaims.

No. CV–F–90–698 OWW.

United States District Court,
E.D. California.

Oct. 31, 1991.

Robert C. Vanderet, Katherine W. Pownell, Jens B. Koepke, O'Melveny & Myers, Los Angeles, Cal., Eric K. Hansen, Jory,

Peterson & Sagaser, Fresno, Cal., for plaintiff.

Christopher Q. Britton, Michael R. Weinstein, Ferris & Britton, San Diego, Cal., for defendant.

## MEMORANDUM OPINION RE EVIDENTIARY HEARING ON ISSUE OF CHANNEL CAPACITY

WANGER, District Judge.

The evidentiary hearing pursuant to Order Bifurcating Issue of Channel Capacity and Setting Evidentiary Hearing was held September 5 and 6, 1991.

### PROCEDURAL HISTORY

Sierra filed this lawsuit November 13, 1990, seeking declaratory and injunctive relief, to enforce WestStar's alleged obligation under the 1984 Cable Act, 47 U.S.C. § 532 to designate channels for commercial use by unaffiliated persons based on the allegation that WestStar has 36 or more "activated channels." Sierra sought and obtained a temporary restraining order under which it operated Channel 12 until January 4, 1991. The Court upon the recommendation of both parties appointed an expert who rendered his report concluding that WestStar did not have 36 activated channels.

WestStar sought summary judgment. Upon the submission by Sierra of the opinion of its retained expert that WestStar had 36 or more "activated channels," an evidentiary hearing was ordered to determine whether the cable system operated by WestStar as of November 19, 1990, had 36 activated channels as that term is defined by 47 U.S.C. § 532(b)(1)(A) and related rules and regulations of the Federal Communications Commission. The evidentiary hearing was held September 5 and 6, 1991.

### FACTUAL BACKGROUND

WestStar owns and operates a cable television system, which it purchased from Bishop Cable TV, Ltd., in early 1986. The cable system serves the City of Bishop and Inyo County under separate franchises. WestStar's TV cable system is operated from a single headend facility located in a windowless 15' × 20' building located on Airport Road near the Bishop Airport in Inyo County, California. The antenna site is located adjacent to the headend.

Sierra, under written lease with WestStar's predecessor, leased Channel 12, which it operated as ICTV Channel 12. The lease expired November 18, 1990. Sierra operated under the temporary restraining order till January 4, 1991. Since January 4, 1991, WestStar has operated Channel 12.

Sierra's Channel 12 was the sole independent television station in Inyo County, a rural sparsely populated area, which receives local television only through cable. Sierra offered diverse programming from an independent source. Sierra established a favorable and loyal audience.

Prior to the lease expiration, Sierra attempted unsuccessfully to negotiate with WestStar for lease renewal.

The WestStar cable system was inspected by Dane Ericksen of the firm Hammett & Edison, Consulting Engineers, Inc. A principal of that firm, Robert Hammett, was originally recommended to the Court by both parties to aid in the activated channel determination. Mr. Ericksen's inspection was conducted December 14, 1990.

Mr. Ericksen is a registered electrical engineer who previously worked for 12 years for the Federal Communications Commission (FCC) as a field engineer. He has performed field tests, enforced regulations for cable television systems, and has extensive additional experience in the cable television industry as a consulting electrical engineer. Mr. Ericksen concluded the cable system did not have 36 activated channels.

Mr. Ericksen was retained by WestStar to testify on its behalf at the evidentiary hearing. He has never testified on behalf of a cable operator. He tested the WestStar system while he was with the FCC. His current employer performed work for WestStar before Mr. Ericksen joined the firm. This prior work was disclosed to both parties before the appointment of his firm as court expert.

Sierra retained Jonathan Kramer, who is not an engineer, but has performed approximately 500 cable system tests and approximately 60 cable system evaluations. Mr. Kramer inspected the WestStar cable system May 8, 1991. His report concluded that the headend of WestStar's Bishop cable system is capable of combining 44 channels onto the cable distribution trunk.

Mr. Kramer almost exclusively represents cable franchisors, who are interested in providing the widest possible access to cable television. He has never testified on behalf of a cable operator. He acknowledged that it was in the interests of all his clients to see that Sierra obtained access to channel capacity in this case.

The WestStar cable system has two essential parts: the headend and the distribution system. The entire cable system is served by a single headend located near the Bishop Airport. Television broadcast signals reach the headend from various sources, including satellites, microwave system, over-the-air signals and local origination. Each broadcast signal is received at the headend, processed, assigned a specific radio frequency (RF) carrier for the desired cable channel, and combined with other RF carriers (cable channels) onto a single coaxial cable for transportation and delivery to subscribers via the distribution system.

The dispute between the parties arises out of their differing interpretations of the meaning of the term "activated channel" to determine commercial access requirements. Sierra contends that the headend of WestStar's cable system consists of three 12–port combiners and one 8–port combiner. From this Sierra argues that WestStar's headend is capable of combining 44 channels onto the cable distribution system trunk. Sierra offered Mr. Kramer's opinion that it is the number of input ports in the headend combiners that dictates the number of activated channels the headend can combine onto the single cable trunk. Sierra argues that the channel capacity of a cable distribution system is solely determined by counting the number of input ports in the headend combiners, here 44.

Sierra maintained that while it is common to place additional equipment such as modulators, processors, receivers, scramblers, and descramblers in the headend building in proximity to the headend as a matter of convenience and economy, such equipment need not be located at the headend and is not an integral part of the headend. Both parties agreed that receiving, modulating and processing equipment is required for a cable operator to actually deliver an RF carrier signal to subscribers. According to Sierra, it does not matter that modulators and/or processors are not in place because the cable operator does not provide programming on channels which could be made available to subscribers; if combiner ports exist, even if they are unavailable to receive RF carriers, "activated" channels exist, equal to the total number of combiner ports.

WestStar refers to the language of the Cable Act, FCC regulations, and legislative history to contend that "activated channels," defined as "those channels *engineered* at the headend of the cable system ..." (Emphasis added) (47 U.S.C. § 532(b)(5)(A)), means that the necessary equipment, including modulators and processors, must be in place to make channels generally available to residential subscribers of the cable system. It contends that its system has never had 36 "activated" channels, engineered at the headend.

Resolution of the difference in the parties' positions requires understanding the technology of cable television systems, statutory construction and application of the Cable Act definition of "activated channels."

WestStar's distribution system delivers signals for cable channels at assigned frequencies. The distribution system emanates from the headend. It consists of the trunk, distribution or feeder cable, and service drops (both overhead and underground). Trunk amplifiers are spaced along the trunk lines (distribution cable) to maintain signal strength and balance. Subscribers are served by service drops from taps on the distribution cable, which in turn is connected to the trunk and the trunk

amplifiers. Both experts observed that the WestStar headend was comprised of electronic equipment racks, satellite and microwave receivers, satellite descramblers, modulators, processors, and a combining network. All modulators and processors utilized to transmit television signals for each cable channel are located at the headend of the WestStar cable system.

Cable channels are assigned standard 6 megahertz (MHz) segments of the frequency bandwidth as part of industry practice and custom.[1] A distribution system designed for a 300 MHz bandwidth has the nominal capability of transmitting 35 to 37 cable channels (depending if channels A–1 and A–2 are included).[2] Since early 1986 the non-rebuilt area of the WestStar cable system has been designed (equalized) for a 220 MHz bandwidth.

A modulator is an active device which accepts as input, video and audio signals. It generates a television signal modulated as a radio frequency (RF) carrier for the desired cable channel. A processor is an active device which accepts a television signal already modulated as an RF carrier, often at a weak level; it amplifies and frequency converts or heterodynes, the signal to the desired channel.

The experts agree that whatever the signal source, either a modulator (for satellite and microwave systems) or a processor (for over-the-air and local origination) is necessary to modulate or convert the signal to the standard RF carrier for each desired television channel. One modulator or processor must transmit each television signal for each cable channel from the headend through the distribution system. The time required to remove or add a modulator or processor, is comparable within 5–10 minutes, to the time to remove or add a combiner.[3]

The combining network is the passive equipment which takes the individual output of each modulator and processor (i.e., the RF carriers for each desired cable channel), and combines them onto a single coaxial cable for transportation along the distribution cable to subscribers. Cable channel service cannot be delivered without an RF carrier generated by a modulator or frequency converted by a processor to the desired cable channel frequency.

Service on a cable channel can be delivered to subscribers without programming if there is an RF carrier at the standard frequency of the desired cable channel. This is called a "dark channel."

The WestStar cable system utilizes combining equipment which consists of three scientific Atlanta 12–port combiners and one 8–port combiner. The 8–port combiner of the WestStar system was used to combine 7 satellite F.M. radio signals. At the times of the inspections by Mr. Ericksen and Mr. Kramer, of the 36 total combiner ports on the three 12–port combiners, 8 combiner ports were unused (i.e., available) and 28 combiner ports were being used as follows: 25 combiner ports were being used for cable channels 2–24 and NN–50; one combiner port was used for F.M. radio; one combiner port was used for the combined satellite (Galactic Radio) F.M. channels coming from the output of the 8–port combiner; and one combiner port was used whenever a special pay-per-view event was to be shown on channel 12 in place of local programming. Only one open port existed on the 8–port combiner. This open port, as configured, was not usable for a cable television channel, because the signal loss through all of the combiners would be too great.

At the time of the hearing, the combining network equipment was installed and configured in the same manner as it was at the times of the inspections with one exception: cable channel 5 was hooked into the second combiner port on the bottom, not the mid-

---

1. For example, cable channel 2 is assigned 54–60 MHz, cable channel 13 is assigned 210–216 MHz. (Defendant's Ex. A)

2. Mr. Bressler, WestStar's operations manager, testified that no modulators or processors are in

place to program or deliver signals on Channels A–1 and A–2.

3. Less time is necessary to remove or add a modulator or processor then to remove or add a combiner.

dle 12–port combiner. At all relevant times, twenty-four channels, 2–25, were used to carry video programming. One channel, NN–50, was used for automatic gain control.[4]

To activate enough additional channels to make 36 channels generally available to residential subscribers, WestStar must install 11 additional modulators and/or processors. Such an expansion will likely require additional equipment, including: satellite or other receivers, combining equipment and AC power circuits. The evidence did not preponderate whether additional rack space and air conditioning is required to add programmed channels.

At the time of WestStar's acquisition, the cable system had a 300 MHz bandwidth, which was engineered (spaced and equalized) to a 220 MHz bandwidth. In early 1988, WestStar commenced to completely rebuild the cable system to a 450 MHz bandwidth to provide 60–channel capability.

The rebuild project has never been completed because WestStar ran out of money. WestStar's line of credit extended by the Bank of New England was eliminated when that Bank failed. Mr. Iacopi, WestStar's executive vice-president, testified without contradiction that notwithstanding continuing good faith efforts, WestStar has been unable to secure financing to complete the rebuild.

Rebuild work stopped in July 1989, before this dispute. Cessation was unrelated to the issue of commercial channel access. The estimated current cost to complete the rebuild of WestStar's distribution system is approximately 1.8 million dollars.

As of September 1991, 17 strand miles (24%) of the system-wide 72 strand miles emanating from the headend had been rebuilt. Within the rebuilt area, the distribution system has a 450 MHz bandwidth, capable of delivering service to subscribers over 60 channels. The rebuilt area extends to most of the City of Bishop, reaching

approximately 97% of WestStar subscribers within the City of Bishop.

As of November 30, 1990, the Bishop cable system had 4479 subscribers of whom 1742 subscribers or 39% were located within the City of Bishop. As of June 30, 1991, the Bishop cable system had 4547 subscribers of whom 1758 or 38.7% were located within the City of Bishop. The rebuilt area of the distribution system serves approximately 40% of the total system subscribers and 24% of total system strand miles.

Mr. Ericksen testified that the existing distribution system does not have a bandwidth capable of delivering signals on 36 channels to subscribers outside the rebuilt area of the system. Mr. Kramer testified that the distribution system had a bandwidth capable of delivering signals on 36 channels to subscribers in the rebuilt area and an area located only within one, or at most two, trunk amplifiers beyond the rebuilt area of the system, covering 3.2 strand miles and 107 subscribers.

Each expert applied different technical tests in reaching different conclusions as to whether the WestStar cable system had 36 activated channels. Mr. Kramer opined that the 44 combiner ports present at the headend represent 44 "activated channels" engineered at the headend. He admitted that as presently engineered, approximately 60% of the WestStar system could not deliver RF carriers for 44 channels. Mr. Ericksen's testimony was more persuasive based on his experience with proof of performance testing, cable system evaluation and FCC regulation compliance work, developed in 12 years as an FCC field engineer and inspector and his later work as a cable system engineer. His opinion that the WestStar headend is not engineered to deliver services on 36 or more channels to subscribers is accepted.[5] Mr. Kramer opined that over 58% of the total cable system subscribers, located on the nonrebuilt area, would not receive 36 or more channels even if sufficient equipment were added to the WestStar headend.

4. NN–50 is a dark channel.

5. The evidence demonstrates the rebuilt area of the system has 60–channel capability, but that

no more than 25 activated channels are generally available to residential subscribers in any area of the system.

Sierra offered statements made by Susan Hook, general manager of WestStar, at an October 9, 1990, meeting of the Bishop City Council:

> For the record, we, *when the rebuild is complete,* will have 60 activatable channels. Right now, in parts of the system, that's true, we do. In about a third of the system, we have 60 activatable channels. (Emphasis added.)

and

> I'm not sure how many people are here tonight that live in the City limits, but, that's pretty much where the 60 channel capability is. The system in ... *the rest of the system has not been rebuilt.* You would not get anything past about 2 ah, channel 25, although we're looking to try to squeeze bandwidth. It's not there right now. (Emphasis added.)

Ms. Hook's statements are not admissions. The statements are consistent with the testimony of both experts. That is, that WestStar's cable system has 60 channel *capability* in the rebuilt area, but then and as of the time of the hearing, delivered only 25 channels within the City limits of Bishop and throughout its system.

Sierra suggests that if WestStar's two franchise areas are treated as separate "communities" or "franchises," it is entitled to lease access in the City of Bishop. WestStar has submitted separate community unit data to the FCC on FCC Form 325, Schedule 1, for each system community unit it serves; i.e., the City of Bishop and surrounding County of Inyo area. WestStar has submitted physical system data on the number of current and potential subscribers and the total length of cable plant located within each system community unit to the FCC on FCC form 325, Schedule 2, a single form.

WestStar reports signal leakage performance to the FCC on FCC form 320, which identifies the entire cable system as Physical System IT:00512. Although FCC form 320 signal leakage performance reports are submitted for each community unit, the signal leakage reported is deter-

mined by testing of the entire cable system. Separate measurements for signal leakage are not made for each community unit. It is standard industry practice to conduct proof of performance tests on a cable system-wide basis; not to performance test each community unit separately.

Sierra does not ascribe any bad faith to WestStar in the operation and management of the cable system. However, Sierra asserts hypothetically that considering headend equipment other than combiners to determine activated channels, subjects the public to the risk of improper manipulation by the operator. WestStar has not removed any headend equipment or interfered with cable system testing to improperly influence the determination of the number of activated channels in its cable system. Nor has WestStar engineered or operated its cable system headend to avoid any lease access obligation.

## THE LAW OF LEASE ACCESS

### *Statutory Purpose*

Section 612 of the 1984 Cable Act, 47 U.S.C. § 532(a) ("the Act") sets forth the purpose of and policy for lease access requirements: "To assure that the widest possible diversity of information sources are made available to the public from cable systems in a manner consistent with growth and development of cable systems." H.R.Rep. at 47, 1984 U.S.Code Cong. & Admin.News 4655 at 4684. To prevent limiting the information sources available to the public Congress required large cable operators to reserve some channels for use by independent commercial programmers.[6] *Media Ranch, Inc. v. Manhattan Cable Television,* 757 F.Supp. 310, 314 (S.D.N.Y.1991). Sierra suggests that to serve these objectives any doubt should be resolved in favor of commercial access. WestStar contends that the policy favoring diversity of information sources does not mandate affirmative change to the engineering of a cable system, which has not yet grown and developed to provide 36 activated channels.

---

**6.** "Large" operators are those operating 36 or more activated channels.

Section 532(a) provides that the access policy is to be implemented in a manner "consistent with growth and development of cable systems." The Act does not require that the operator of a cable system provide "activated channels" to assure commercial access. 47 U.S.C. § 532(b)(2). "An operator of any cable system with fewer than 36 activated channels shall not be required to designate channel capacity for commercial use by persons unaffiliated with the operator, unless the cable system is required to provide such channel capacity under the terms of a franchise in effect on the date of the enactment of the title." 47 U.S.C. § 532(b)(1)(D). WestStar had no such franchise in effect on October 30, 1984. Sierra is an "unaffiliated person" within the meaning of § 532(b)(1)(D).

*Commercial Access*

Section 532(b)(1)(A) provides that the operator of any cable system with 36 or more activated channels shall designate for commercial use by unaffiliated persons, 10% of channels which are not otherwise required for use (or the use of which is not prohibited) by federal law or regulation. Section 532(b)(5)(A) defines the term "activated channels" as "those channels engineered at the headend of the cable system for the provision of services generally available to residential subscribers of the cable system, regardless of whether such services actually are provided...."

The statutory definition of the term "activated channels" is not clear and unequivocal on its face. There is no case law that interprets the term. Under established principles of statutory construction the Court must look to the language of the statute itself and its legislative history. *Brock v. Writer's Guild America West, Inc.*, 762 F.2d 1349, 1353 (9th Cir.1985). Legislative history is a valid means to ascertain statutory purpose if a statute is unclear or ambiguous. *Burlington Northern Railroad Co. v. Oklahoma Tax Comm.*, 481 U.S. 454, 107 S.Ct. 1855, 1860, 95 L.Ed.2d 404 (1987).

The legislative history of § 612 explains what is meant by the term "activated channels:"

The term "activated channels" ... means those channels engineered at the headend of the cable system for the provision of services generally available to residential subscribers, regardless of whether cable services are actually being provided over all of those channels. *The term is used to distinguish between channels which are not being used— that is, dark channels which are nevertheless to be counted in making the subsection (b) calculations—and channel capacity which the cable system might at some time in the future be capable of delivering, but is potential channel capacity that is not presently delivered to subscribers.* For instance, a cable system might have been constructed by two cable trunks being laid throughout a city with the second trunk capable of doubling the channel capacity of the system when need for a channel capacity increases, but the cable system is only transmitting services at the present time through the first cable trunk. The potential channel capacity deliverable by the second cable trunk would not be considered *activated*, however, *channel capacity actually available to subscribers* as part of the first trunk, although some may not yet be carrying any programming (so-called dark channels), would be considered activated. (Emphasis added.)

House Report No. 934, 98th Cong.2d Sess. Reprinted in 1984 *U.S.Code Cong. & Admin.News*, 4655 at 4686.

In using the term "activated channels" Congress intended to differentiate between channels actually available to deliver services to subscribers (whether "dark" or carrying video programming) and channel capacity that is not presently delivered to subscribers, but which the cable system might be capable of delivering in the future. *Id.* at 4686. Sierra suggests that channel capacity or future capability to deliver services for a cable channel after further engineering and/or equipment installation satisfies the definition of "activated channels."

■ Statements by individual legislators may provide evidence of legislative intent when they are consistent with the statutory history and other legislative history. *Brock v. Pierce County,* 476 U.S. 253, 106 S.Ct. 1834, 1840–1841, 90 L.Ed.2d 248 (1986). The Cable Act legislative history contains an instructive colloquy between representatives Wirth and Bliley on the meaning of "channel capacity:"

> MR. BLILEY. The federal set-aside of channels for commercial use is triggered by the number of "activated channels" on the cable system. Does that mean the system's total channel capacity?
>
> MR. WIRTH. Mr. Speaker, if the gentleman will yield, "activated channels" means only the number of channels that subscribers actually are receiving. Although this would include any so-called dark channels which subscribers receive but which currently carry no programming, it would not equate to the total channel capacity of the system—the maximum number of channels that the system would carry—*unless the operator actually had the equipment in place at the headend* of the system to deliver the maximum number of channels. (Emphasis added.)

130 Cong.Rec.H. 10441 (Daily Ed. Oct. 1984) (Statement of Rep. Wirth, Floor Manager of H.R. 4013), reprinted in 1984 *U.S.Code Cong. & Admin.News, supra,* at 4751. *See, Playboy Enterprises v. Pub. Serv. Comm'n of P.R.,* 698 F.Supp. 401, 416 fn. 6 (D.Puerto Rico 1988), aff'd, 906 F.2d 25 (1st Cir.1990). Sierra objects to consideration of Rep. Wirth's statements as "directly contradictory to the definition in 47 U.S.C. § 532." The definition of "activated channels" in § 532(b)(5)(A) is anything but clear, Rep. Wirth's statements directly address the meaning of the term "activated channels."

■ The colloquy reveals that the term "activated channels" does not mean unengineered potential channel capability.

Rather the test for "the maximum number of channels that the system could carry" is based on the engineering, including all equipment actually in place at the headend of the system. Congress intended that the term "activated channels" mean the number of channels actually delivered to subscribers [7] (whether "dark" or carrying programming), not the total channel capacity of the system. This measurement is made by analysis of the number of channels for which engineering and equipment is actually in place at the headend of the system to carry and deliver services to residential subscribers. If the definition is amplified by adding the requirement that the channel "actually be received" by subscribers, analysis of each subscriber's technological capabilities to receive all signals being broadcast on system channels could be required. The legislative history specifically refers to "channel capacity actually available to subscribers." 1984 *U.S.Code Cong. & Admin.News* at 4686.

In revising its rules and regulations to supplement provisions of the 1984 Cable Act, the FCC referred to the term "activated channel" as follows:

> All channels used for the provision of video and other programming services generally available to subscribers. In addition, those channels not carrying any programming *but capable of delivering cable service to subscribers without additional engineering modification of the system* will be considered activated for the purpose of access channel allocation. (Emphasis added.)

This language reemphasizes that the focus is on the cable operator's system which has headend engineering presently capable of delivering services over channels without additional engineering modification. 50 Fed.Reg. 18,637, 18,643 (1985) (FCC 85–179). The evidence established that before WestStar will have more than 25 channels over which subscribers' cable service can be delivered there must be additional equip-

---

**7.** Sierra argues that Rep. Wirth's statement that "activated channels" *means only the number of* channels that subscribers *actually are receiving"* should be disregarded. (Emphasis added.) Foreclosing consideration of the element of re-

ceipt of the channel by subscribers risks abrogating the legislative history that refers to channels *engineered at the headend for present delivery to subscribers.* (Emphasis added.) 1984 *U.S.Code Cong & Admin.News,* at 4686.

ment and engineering at the headend. Mr. Bressler, WestStar's operations manager, testified that the cost to upgrade the present WestStar system to 300 MHz bandwidth capacity necessary to deliver services on 36 channels, is $252,594.90.

In using the phrase "regardless of whether such services are actually provided" in the statutory definition of "activated channels," Congress intended that channels actually delivered to subscribers but carrying no programming ("dark channels") be counted as activated channels.[8] The distinction is between channels on which services are actually delivered to subscribers and channel capacity for channels the system is not engineered to deliver, but which might, upon further engineering at the headend, be capable of being delivered in the future. This is consistent with the legislative objective to encourage diversity of information from objective sources "in a manner consistent with growth and development of cable systems." Nowhere in the Cable Act or its legislative history is there a suggestion that cable operators are under an affirmative duty to engineer, "grow," or develop their cable systems at any time or in any manner to ensure access to unaffiliated persons for commercial use. Here, no more than 25 channels can be made generally available to subscribers without further equipment and engineering at the headend.

Congress has attempted to balance the economic concerns of cable operators and the public's need to obtain information and programming from diverse and independent sources. It has determined to impose any economic burden of access on larger operators. The choice to grant an information monopoly to operators who provide fewer than 36 activated channels has been made by the legislature. Sierra's interpretation of cable television engineering and technology rewrites the statutory definition of "activated channels," a prerogative not within the judicial authority of the court.

A finding that WestStar had 36 activated channels would impermissibly compel it to incur costs for additional equipment and engineering.

▉ Sierra's expert acknowledged the generally accepted definition of "headend" in the cable industry: "The electronic equipment located at the start of a cable television system, usually including antennas, earth stations, preamplifiers, frequency converters, demodulators, modulators, and related equipment.[9] The provision "engineered at the headend" as used in § 532(b)(5)(A) means all the equipment required to deliver activated channels to residential subscribers; i.e., combiners, receivers, modulators, processors, frequency converters, and related equipment. Sierra is correct in its contention that it is the engineering of channels at the headend to provide services generally available to residential subscribers of the cable system that is determinative.

▉ This leads to scrutiny of that portion of the language of Section 532(b)(5)(A) which provides that "activated channels" are "for the provision of services *generally available to residential subscribers* of the cable system,...." The statutes, legislative history, and case law do not define the term "generally available to residential subscribers."

WestStar has quoted dictionary definitions of "general" as follows:

> *GENERAL:* From Latin word *genus.* It relates to the whole kind, class or order. *Leuthold v. Branjord,* 100 Mont. 96, 47 P.2d 41, 45; pertaining to or designating the genus or class, as distinguished from that which characterizes the species or individual; universal, not particularized, as opposed to special; principal or central, as opposed to local; *open or available to all* as opposed to select; obtaining commonly, or recognized universally, as opposed to particular; universal or unbounded, as opposed to limited; comprehending the whole or *directed to the*

---

**8.** Channel NN–50 is an example. This channel is actually provided to subscribers on the WestStar system but carries no programming.

**9.** 1988 National Cable Television Association and Society of Cable Television Engineers Glossary of Cable Television Terms.

*whole as distinguished from anything applying to or designated for a portion only.* Extensive or common to many. (Emphasis added.)

*Roget's College Thesaurus, Revised Edition* (1985) at p. 229 lists synonyms to the adverb "generally:"

Generally, in general, generally speaking, on an average; *always,* for better or worse; for the most part, by and large, *on the whole,* in the main; in the long run; whatever, whatsoever; everywhere, wherever; to a man, *one and all,* all tolled. See *colloquy* across the board.

The Random House Dictionary of the English Language, College Edition, 1969, at p. 550, defines "available" as: "Adj. 1. suitable or ready for use; usable ... 2. readily obtainable; ...."

Based on these definitions and FCC rules which treat cable systems on a system-wide basis, the most reasonable interpretation of the term "generally available to residential subscribers" is that the services provided on channels delivered must be to all residential subscribers. WestStar's distribution system has been equalized to 220 MHz bandwidth. It cannot carry 36 channels. The engineered headend lacks sufficient equipment to deliver services to its residential subscribers over 36 or more channels. WestStar has never made 36 or more channels available to residential subscribers.

Sierra expresses concern that a definition of "activated channels" measured by headend engineering is "too easily manipulable by cable operators, who have total control over the equipment contained in the headend building." To the contrary, objective criteria exist to determine whether any cable system is engineered to and does deliver activated channels. Even if processors or modulators were removed prior to inspection, the distribution system's frequency bandwidth is determined by the power of the amplifiers on the distribution system. This is subject to confirmation by direct observation. Moreover, FCC technical information reports about system capacity, which are filed under oath, and broadcast history will readily identify the number of channels delivered (programmed and unprogrammed); all of which assure the credibility of the operator.

Sierra implicitly suggests that it is not "engineering" to add processors and modulators or to modify the equalizer that reduces the 300 MHz bandwidth of the system to 220 MHz. Sierra claims that the WestStar system has 36 channel "capacity" through a single trunk distribution system. This argument could be persuasive absent the express language in the legislative history that channel "capacity" or future "capability" based upon the addition of equipment does not meet the definition of "activated channel." The distinction lies in the language that to be "activated," the channel must be *delivered* to residential subscribers. (Emphasis added) The requirement of channel delivery, whether the channel is programmed or dark, is specifically identified: "... the operator actually had the equipment in place at the headend of the system to deliver the maximum number of channels." *1984 U.S.Code Cong. & Admin.News, supra,* at 4751. By Sierra's expert's testimony, a combiner is passive. It does not "deliver" the channel signals to the distribution system without modulators or processors.

Here, approximately 24% to 40% of the system has a 450 MHz bandwidth capable of supporting 60 channels. The balance of the system has a 300 MHz bandwidth equalized to 220 MHz because the engineered headend does not have sufficient equipment to deliver 36 activated channels. Accepting, *arguendo,* that the system 300 MHz bandwidth has the potential capability to support 36 channels and crediting WestStar's intention to complete system expansion at some uncertain future time, the statutory definition of activated channels is not satisfied. The equipment to deliver 36 channels is not in place. There must be further engineering at the headend to deliver 36 channels.

Sierra argues that if a community unit or franchise approach is taken, that the City of Bishop franchise meets the 36 activated channels test. Sierra states, "it is not clear that the FCC's 'system approach' to exam-

ining cable systems applies in the context of the lease access provisions of the Cable Act." There are two reasons this contention cannot succeed. First, as explained below, the legislative history of the Cable Act does make clear that cable systems are treated as entire, on a systemwide basis. Second, the WestStar Cable system has never been engineered at the headend to deliver 36 activated channels at any part of its distribution system.

Since April 18, 1977, under both the Communications Act of 1934, the 1984 Cable Act, and FCC rules and regulations whenever Congress and the FCC desire to impose an obligation upon cable operators on a community-by-community (i.e., franchise-by-franchise) basis, statutes, rules or regulations have expressly so stated.

A single cable system can encompass and serve multiple communities. Here, WestStar holds two franchises and serves from a single headend at least two communities, the city of Bishop and County of Inyo.

Prior to April 18, 1977, the FCC's rules and regulations implementing the Communications Act of 1934 provided that for definitional purposes, each separate community was considered to be served by a separate cable television system, regardless of whether that "system" was simply a segment of a larger facility serving several communities. Former § 76.5(a) of the FCC rules defined "cable television system" in pertinent part as follows:

> *Cable Television System (or CATV System).* Any facility that, in whole or in part, receives directly, or indirectly, over the air, and amplifies or otherwise modifies the signals transmitting programs broadcast by one or more television or radio stations and distributes such signals by wire or cable to subscribing members of the public who pay for such service, ....
>
> **NOTE**—*In general, each separate and distinct community or municipal entity* (including unincorporated communities within unincorporated areas) served by cable television facilities *constitutes a separate cable television system, even if there is a single headend and identical*

*ownership of facilities extending into several communities, See,* e.g. *Telerama, Inc.,* 3 FCC 2d 585 (1966); *Mission Cable TV, Inc.,* 4 FCC 2d 236 (1966). (Emphasis added.)

After a rulemaking proceeding initiated by the FCC in 1975 *(Notice of Proposed Rulemaking in Docket 20561,* FCC 75–850, 54 FCC 2d 825 (1975)), the FCC issued an order amending its definition of a cable television system, effective April 18, 1977. *First Report and Order in Docket 20561,* FCC 77–205, 63 FCC 2d 956 (1977). Section 76.5(a) of the rules and regulations was amended to define "cable television system" in pertinent part as follows:

> *Cable Television System.* A nonbroadcast facility consisting of a set of transmission paths and associated signal generation, reception, and control equipment, under common ownership and control, that distributes or is designed to distribute to subscribers the signals of one or more television broadcast stations,
> . . . .

63 FCC at 999.

The Cable Television System definition deleted the *Note* following it, which previously specified that each community was to be treated as having a separate cable system.

A new term was defined: "system community unit," which applied to those rules applicable on a community-by-community basis. Section 76.5(mm) was adopted to define "system community unit" as follows:

> *System Community Unit; Community Unit.* A cable television system, or portion of a cable television system, that operates or will operate within a separate and distinct community or municipal entity (including unincorporated communities within unincorporated areas and including single, discrete unincorporated areas.)

In its *First Report and Order, supra,* the FCC examined all the rules that might be affected by the new definition of "cable television system." Those rules that it determined should be applicable on a community unit-by-community unit basis (e.g., sig-

nal carriage rules, franchise standards, certification rules, annual report rules) were amended to be specifically applicable on a community unit-by-community unit basis as distinguished from a system-wide basis.[10]

Upon a petition for reconsideration, the FCC sustained its order adopting the system-wide definition of a cable television system. *Memorandum Opinion and Order in Docket 20561*, FCC 78–87, 42 Rad. Reg.2d 507 (1978).[11]

The definition of a cable television system contained in Section 76.5(a) remained unchanged from April 18, 1977, until the FCC revised its rules and regulations pursuant to a rulemaking proceeding following the passage of the 1984 Cable Act. *See,* 50 Fed.Reg. 18,637 (1985) (FCC 85–179).

When the FCC revised its rules and regulations to implement the 1984 Cable Act, Section 76.5(a) was amended to adopt the language of the definition of a cable system contained in the 1984 Cable Act (47 U.S.C. § 522(6)). *Id.,* 50 Fed.Reg. at 18,641 (par. 27), 18,661.[12]

The manner in which annual reports and signal leakage reports are prepared and filed by WestStar with the FCC corroborate that when Congress or the FCC desires to apply a rule or requirement on a community unit-by-community unit basis, it expressly states that requirement. *See,* 47 CFR § 76.403. These reporting rules further demonstrate that if Congress or the FCC intended that determination of the number of activated channels for commercial access obligations for a cable system was to be made other than on a system-

wide basis, the statute, rules, or regulations would have so stated. This construction of the law is most consistent with the Cable Act which recognizes that the economic burden of upgrading a cable system to provide additional channels to meet commercial access requirements cannot be involuntarily imposed on a cable operator.

Sierra has cited *Media Ranch v. Manhattan Cable Television, supra,* 757 F.Supp. at 317–19, for the proposition that determination of the number of activated channels for commercial access should be made on a franchise-by-franchise basis. *Media Ranch* is wholly distinguishable. There, no dispute over the number of activated channels was raised.[13] Moreover, the district court never ruled on the question whether the number of channels to which access was sought should be measured by upgraded areas of the cable system.[14] *Media Ranch* does not hold that activated channels are to be measured only by an upgraded portion; i.e., less than the whole of a cable system to determine lease access requirements.

It is unnecessary to reach WestStar's arguments about the impracticability of identifying which of its activated channels should be assigned to Sierra, as Sierra is not entitled to access to any of WestStar's activated channels.

## CONCLUSION

WestStar's cable system does not have 36 activated channels. WestStar had and has no present obligation to designate and set aside channel capacity for commercial

---

10. Among the rules reviewed were the then existing lease access rules. Prior to the rulemaking proceeding, those lease access rules were applied on a headend basis despite a definition of cable system co-extensive with separate franchise territories. After the rulemaking proceeding, the lease access rules continued to be applied to each cable system as an integrated economic unit. *See, First Report and Order, supra,* par. 36 at page 973.

11. That standard most accurately reflects a system's financial ability to sustain the economic burden of the rules, and to generally carry forward the existing concept of common owner-

ship and technical integration in a more technically precise and realistic standard. 42 Fed. Reg. at 516.

12. Any differences between the former rule and the new rule adopting verbatim the cable television system definition from the 1984 Cable Act concern matters unrelated to and leave unaffected the system-wide concept in the definition. *Id.,* 50 Fed.Reg. at 18,640–18,641 (paras. 17–27).

13. The parties stipulated the cable system had 42 activated channels. 757 F.Supp. at 317–18.

14. 757 F.Supp. at 319, fn. 10.

use by unaffiliated persons. Sierra's complaint must be dismissed.