**Al GOLDSTEIN and Media Ranch, Inc.; Lou Maletta and Gay Cable Network, Inc.; and Cable Access Network, Inc., Plaintiffs,**

v.

**TIME WARNER NEW YORK CITY CABLE GROUP and the City of New York, Defendants.**

**Steve GRUBERG and Cable Access Network, Inc., Plaintiffs,**

v.

**TIME WARNER NEW YORK CITY CABLE GROUP, Defendant.**

Nos. 96 CIV. 7462(LBS), 97 CIV. 0673(LBS).

United States District Court, S.D. New York.

April 24, 1998.

---

Norwick & Schad, New York, NY, Kenneth P. Norwick, Robert T. Perry, of counsel, for Plaintiffs Steve Gruberg and Cable Access Network, Inc.

Cravath, Swaine & Moore, New York, NY, Stuart W. Gold, Christopher J. Steskal, Jeffrey L. Nagel, Angelia M. Dickens, for Defendant Time Warner New York City Cable Group.

## OPINION

SAND, District Judge.

The Plaintiffs, Steve Gruberg and Cable Access Network, Inc. (collectively "Gruberg"), have brought two suits [1] against the Defendant, Time Warner Cable of New York City ("Time Warner"),[2] seeking equitable and declaratory relief, as well as damages, for claims arising out of the Cable Act [3] and various regulations promulgated thereunder. Presently before the Court are three motions: (1) the Plaintiffs' motion to compel discovery pursuant to Fed.R.Civ.P. 37(a); (2) the Defendant's motion to compel discovery pursuant to Fed.R.Civ.P. 34(b) & 37(a); and (3) the Defendant's motion for summary judgment pursuant to Fed.R.Civ.P. 56, the resolution of which involves several significant questions of first impression under § 612(d) of the Cable Act. For the reasons set forth below, the Defendant's motion for summary judgment is granted in part and denied in part, and both suits are hereby

---

**1.** See *Goldstein v. Time Warner*, No. 96 Civ. 7462 (S.D.N.Y. filed Oct. 1, 1996) (*"Gruberg I"*); *Gruberg v. Time Warner*, No. 97 Civ. 0673 (S.D.N.Y. filed Jan. 31, 1997) (*"Gruberg II"*).

**2.** Although the captions to both suits identify the Defendant as "Time Warner New York City Cable Group," the Defendant has advised that the correct designation is actually "Time Warner Cable of New York City." (*See* Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem.") at 1.) Accordingly, the Court directs the parties to submit a proposed order amending the caption.

**3.** See The Cable Communications Policy Act of 1984, Pub.L. No. 98–549, 98 Stat. 2779 ("1984 Cable Act"); The Cable Television Consumer Protection and Competition Act of 1992, Pub.L. No. 102–385, 106 Stat. 1460 ("1992 Cable Act") (collectively codified as amended at 47 U.S.C. § 532). Unless otherwise specified, the term "Cable Act"—without any year preceding it—is a collective reference to both pieces of legislation.

stayed in their entirety pending further action by the Court of Appeals for the District of Columbia Circuit.[4]

## I. BACKGROUND

This Opinion represents the latest stage of the "leased access" litigation that has been on the Court's docket since 1990.[5] In the intervening years, however, the leased access landscape has been reshaped greatly by both congressional and regulatory action.[6] The pertinent developments are described below.

### A. *The Cable Act*

Section 612 requires cable operators to designate a certain percentage of channel capacity for commercial use by unaffiliated programmers. *See* 47 U.S.C. § 532(b). At the present time, a programmer aggrieved by the failure of an operator to make "reasonable" channel capacity available for leased access use can either file suit in federal district court, or petition the Federal Communications Commission ("FCC") for relief. *See* 47 U.S.C. § 532(d).

This choice of fora, however, was not always available. Under the initial regime established by the 1984 Act, Congress permitted cable operators to set the "price, terms and conditions" of leased access use, and the only avenue of relief for aggrieved programmers was through the district court. *See,*

e.g., *Media Ranch, Inc. v. Manhattan Cable Television, Inc.,* 757 F.Supp. 310, 313–14 (S.D.N.Y.1991). Congress was advised, however, that during the ensuing decade commercial leased access use was, as a general matter, too infrequent in light of the clear statutory directives to encourage, *inter alia,* diversity in programming. *Id.* at 314. Suspicion arose that cable operators were systematically sabotaging leased access programmers by insisting on unreasonably high rates for carriage, especially where such leased access programming—which is available to the viewer, theoretically anyway, at no cost—was deemed by the operator to be a competitor of other cable programming in which the operator had a financial stake. *See, e.g.,* H.R.Rep. No. 102–628, at 39–40 (1992), *available at* 1992 WL 166238 (Legis.Hist.).

The 1992 Cable Act attempted to rectify these perceived injustices. In the 1992 legislation, Congress authorized the FCC to establish a pricing formula to determine the "maximum reasonable rates" for leased access use. The legislation also empowered the FCC to establish reasonable terms and conditions for leased access, as well as to create administrative procedures for the "expedited resolution" of any such disputes. *See* 47 U.S.C. § 532(c)(4)(a).[7]

The FCC's execution of its mandate has been controversial since the outset. As one

---

4. *See infra* Part II.D.

5. *See Goldstein v. Manhattan Cable Television, Inc.,* No. 90 Civ. 4750 (S.D.N.Y.) (*"Goldstein"*); *Media Ranch, Inc. v. Manhattan Cable Television, Inc.,* No. 90 Civ. 7218 (S.D.N.Y.) (*"Media Ranch"*); *Gay Cable Network, Inc. v. Manhattan Cable Television, Inc.,* 91 Civ. 7450 (S.D.N.Y.) (*"Gay Cable Network"*). For Opinions discussing various aspects of these cases, see *Goldstein v. Manhattan Cable Television, Inc.,* 916 F.Supp. 262 (S.D.N.Y.1995); *Media Ranch, Inc. v. Manhattan Cable Television, Inc.,* 757 F.Supp. 310 (S.D.N.Y.1991); *Media Ranch, Inc. v. Manhattan Cable Television, Inc.,* No. 90 Civ. 7218, 1992 WL 116588 (S.D.N.Y. May 19, 1992) (mem.).

All three actions—*Goldstein, Media Ranch* and *Gay Cable Network*—have been settled pursuant to confidential agreements.

6. *See generally* Norman M. Sinel *et al., Recent Developments in Cable Law,* 494 PLI/Pat. 185, 468–84 (Oct.1997) (analyzing leased access provisions and various challenges thereto).

7. Under the current rules, an aggrieved party can petition the FCC for relief pursuant to 47 C.F.R. § 76.975 (1997). Such a petition can include claims for both price and non-price violations of the Cable Act, and the FCC, after consideration of the pleadings, may grant the relief requested, in whole or in part, including, but not limited to, ordering refunds, injunctive measures, or forfeitures; denying the petition; or otherwise issuing a ruling on the petition or dispute. *Id.* § 76.975(h). The FCC cannot, however, award damages.

If the FCC finds that the petitioner has demonstrated a *prima facie* violation of the leased access rules, it can order discovery or "specify other procedures necessary for resolution of the proceeding." *Id.* § 76.975(e). Despite the foregoing developments, it should be noted that Congress left intact completely the aggrieved programmer's right to file a § 612(d) "reasonableness" challenge in the district court.

commentator put it, "[t]he FCC's initial report and order—the infamous April 1, 1993 *Rate Order*—had established the 'highest implicit fee' formula for setting the maximum reasonable rates and adopted standards for access terms and conditions," although, to be sure, the leased access provisions were, at the time, "far overshadowed by the other rate regulatory provisions of the order." Jeffrey P. Cunard, *FCC Revises Leased Access Rules*, 14 No. 12 Cable Television & New Media L. & Fin. 1, 1–3 (Feb.1997) (emphasis added).[8]

In the face of enormous industry and consumer pressure, the FCC revisited its initial *Rate Order* through the issuance of the 1996 *Reconsideration Order*.[9] In this *Reconsideration Order*, the FCC clarified a host of issues that had arisen pursuant to its designation of the "highest implicit fee" formula as the controlling rate mechanism for leased access use.[10]

Then, on February 4, 1997, the FCC released its *Second Order*[11] on leased commercial access. In this latter order, the FCC adopted a new pricing formula entitled the "average implicit fee" formula. Thus, the pricing formula *currently* governing the maximum reasonable rate that an operator can charge leased access programmers is the "average implicit fee" formula, not the "maximum implicit fee" formula first articulated in 1993.

The legality of the "average implicit fee" formula is now squarely before the D.C. Court of Appeals in a consolidated appeal, the lead case of which is entitled *ValueVision Int'l. Inc. v. FCC*, App. No. 97–1138 (D.C.Cir.) ("*ValueVision*"). The resolution of that appeal is, for reasons explained more fully below, of great consequence to the litigation presently before this Court.

## B. *The Instant Actions*

### 1. *The Parties*

The Plaintiffs are producers of adult-oriented cable television programming that has become a fixture of late-night New York television during this past decade. (*See* Grier Aff. of 9/19/97 ("Grier Aff."), ¶¶ 9, 11.) Titles of their broadcast programs include "Titillations," "NY Nightlife," "Hot Talk," "Blurbs," "Loops," "Sparkling," "Hot Spots" and "Spicy Stuff." (*Id.* ¶ 10.)

The Defendant is the operator of two cable systems in Manhattan, the Southern Manhattan system and the Northern Manhattan system. (Berman Aff. of 9/19/97 ("Berman Aff."), ¶ 2.) Time Warner has designated Channel 35 on each system for use by part-time leased-access programmers such as Gruberg. (*Id.* ¶ 4.)[12]

According to the Defendant, a "significant number" of part-time leased access programmers on Channel 35 on both cable systems produce programming "that regularly features explicit material, such as nudity, intercourse, oral sex, and carries commercials advertising adult-oriented services, including phone lines for sexually oriented conversations and escort services." (Grier Aff. ¶ 6.) Well-known producers include Al Goldstein and Media Ranch, Inc.; Lou Maletta and Gay Cable Network, Inc.; Robin Byrd and Key Byrd Productions, Inc.; David Eisenberg and Real Life Productions, Inc.; Ben Levine and Temptations Publishing, Inc.; and Richard Ditlevsen. (*Id.* ¶ 8.)

8. *See In the Matter of Implementation of Sections of the Cable Television Consumer Protection and Competition Act of 1992: Rate Regulation,* 8 F.C.C.R. 5631, 1993 WL 757189(FCC) (1993) ("*Rate Order*").

9. *See In the Matter of Implementation of Sections of the Cable Television Consumer Protection and Competition Act of 1992; Rate Regulation (Leased Commercial Access),* 11 F.C.C.R. 16933, 1996 WL 927986(FCC) (1996) ("*Reconsideration Order*").

10. *See, e.g.,* Sinel *et al., supra,* at 468–74; Cunard, *supra,* at 1–3.

11. *See In the Matter of Implementation of Sections of the Cable Television Consumer Protection and Competition Act of 1992; Leased Commercial Access,* 12 F.C.C.R. 5267, 1997 WL 54836(FCC) (1997) ("*Second Order*").

12. For a description of the operation of "Channel J"—the forerunner of Channel 35—see *Urban v. Manhattan Cable Television,* No. 86 Civ. 1821, 1987 WL 14129, at *1–*3 (Oct. 13, 1987) (dismissing § 612(d) Cable Act claims of *pro se* plaintiff).

Time Warner claims that Gruberg is "the most prolific producer of sexually explicit part-time leased access programming" on both of Time Warner's Manhattan cable systems. (*Id.* ¶ 11.) The Plaintiffs counter that Time Warner, through its carriage of, and direct financial interest in, "pay channels" such as Playboy and Adultvision,[13] is itself a "prolific and pervasive purveyor" of sexually explicit, if not "indecent," programming. (*Gruberg I* Compl. ¶ 47.)[14]

In any event, it is undisputed that the Plaintiffs' programming has been carried on the Southern Manhattan system since 1990 and on the Northern Manhattan system since 1996. (Grier Aff. ¶ 10.) Currently, the Plaintiffs' airtime exceeds twenty hour per week on each system, (*id.* ¶ 11), and his programs are cablecast virtually every day of the week. (Norwick Aff. of 11/14/97 ("Norwick Aff."), ¶ 20.)

### 2. *The Litigation*

#### a. *Proceedings Before the FCC*

On April 27, 1995, Gruberg submitted a petition for relief to the FCC ("FCC Petition") requesting an investigation of alleged

overcharging by Time Warner on the Southern Manhattan system. *See Gruberg v. Time Warner*, 12 F.C.C.R. 4946 (Apr. 25, 1997), 1997 WL 199483(FCC). That petition was in the form of a letter, with attached affidavit, from Gruberg's attorney at the time. Without ever holding a hearing, the FCC dismissed the petition nearly two years later in a Memorandum Order and Opinion released on April 25, 1997. *Id.* ¶¶ 10–11.[15]

#### b. *Proceedings Before the Court*

While the FCC Petition was pending, the Plaintiffs filed two suits in this Court. The first suit was filed on October 1, 1996, seeking broad relief with respect to Gruberg's carriage on the Northern Manhattan system. *See Gruberg I*, No. 96 Civ. 7462. The Complaint therein asserts five Causes of Action, (*Gruberg I* Compl. ¶¶ 56–60), only two of which, however, are pertinent to the present motions. Specifically, the Fourth and Fifth Causes of Action,[16] which concern the "prices, terms and conditions" of Gruberg's carriage on the Northern Manhattan system, are the only "active" claims at the present moment.[17]

---

**13.** Time Warner has advised that Playboy and Adultvision "are in fact and have been from time to time leased access channels themselves." (*See* Tr. of 1/8/98, at 30.)

**14.** The discovery disputes are equally contentious. Time Warner, for instance, accuses Gruberg of seeking "most favored nation" status with respect to carriage, as well as to the disclosure of allegedly confidential corporate documents such as the agreements providing for carriage of non-leased access programming services between Time Warner Entertainment Company, the parent of the Defendant here, and national programmers such as CNN and ESPN. (*See, e.g.,* Weiss Aff. of 9/19/97, ¶ 3; Tr. of 1/8/98, at 44.) Gruberg, on the other hand, alleges that the Defendant improperly seeks to secure summary judgment on the basis of *ipse dixit* calculations and assertions. (Pls.' Mem. Opp. Mot. Summ. J. ("Pls.' Mem. Summ. J.") at 12.)

**15.** *See infra* Part II.C (discussing res judicata effects of Gruberg's petition for administrative relief).

**16.** Neither the Fourth nor the Fifth Causes of Action were asserted against the City of New York ("City"), which along with Time Warner is a Defendant in *Gruberg I*. (*See* Letter from Finkelman to Norwick of 9/30/97, ¶ 1.) Accordingly,

the City takes no position with respect to Time Warner's present motion for summary judgment insofar as it relates to these two Causes of Action. (Finkelman Aff. of 11/14/97, ¶ 2.)

The City, of course, is not a Defendant in *Gruberg II*, and thus has no current legal stake in that litigation. (*Id.* at 2 n. 1.)

**17.** In broad terms, the First, Second and Third Causes of Action in *Gruberg I* involve a challenge to Time Warner's "Leased Access Policy on Indecent and Obscene Programming" ("Leased Access Policy"). (*See Gruberg I* Compl. ¶¶ 56–58.) On December 11, 1997, this Court issued a stay of these three Causes of Action pending resolution of the appeals in *Loce v. Time Warner*, which action resides *sub judice* in the Court of Appeals for the Second Circuit. *See* App. Nos. 97–9301(L) (2d Cir.) and 97–9311(XAP) (2d Cir.). The *Loce* appeals squarely address the First Amendment and statutory questions of law relevant to the Defendant's Leased Access Policy, and thus this Court will await enlightenment from the Second Circuit prior to considering the aforesaid Causes of Action. (*See* Tr. of 12/11/98, at 2–9.) For background on some of the issues relevant to the *Loce* appeals, see generally *Denver Area Educ. Telecomm. Consortium, Inc. v. FCC*, 518 U.S. 727, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996).

The Plaintiffs filed the second suit on January 31, 1997, *see Gruberg II*, No. 97 Civ. 0673, asserting two Causes of Action with respect to the "prices, terms and conditions" of Gruberg's carriage on Time Warner's Southern Manhattan cable system. (*Gruberg II* Compl. ¶¶ 18–20.) Among other forms of relief, the Plaintiffs seek the refund of all overcharges on the Manhattan system since 1990.[18] The present motions implicate both Causes of Action in *Gruberg II*.

On March 31, 1997, the Court ordered the consolidation of *Gruberg I* and *Gruberg II* for purposes of discovery only. Moreover, a comprehensive confidentiality order—pertaining to both suits—was endorsed by the Court on April 24, 1997.

### 3. *The Motions*

On September 19, 1997, Time Warner filed its present motion for summary judgment, as well as its motion to compel discovery. Time Warner designated most of its submissions as "confidential" and thus filed them under seal. (*See, e.g.,* Def.'s Mem. at 1–53 (marking every page of legal memorandum to Court as "confidential").)

The Plaintiffs filed their motion to compel discovery on November 21, 1997. After granting several adjournments, the Court held extended oral argument on all three motions on January 8, 1998. (*See* Tr. of 1/8/98, at 1–80.) The Court notes that Time Warner originally designated a considerable number of its submissions as "confidential" and thus submitted them under seal. Pursuant to colloquy motivated by the Plaintiffs' allegations of corporate paranoia, (*see, e.g.,* Pls.' Mem. Mots. Compel Disc. ("Pls.' Mem. Disc.") at 7), Time Warner agreed to reconsider its confidentiality designations, (Tr. of 1/8/98, at 2–6), and in a letter to the Court dated January 12, 1998, dropped most of them. (*See* Letter from Gold to Court of 1/12/98, ¶ 2.) Upon receipt of that letter and certain other exhibits, all three motions became fully submitted.

## II. DISCUSSION

In extraordinarily thorough submissions, Time Warner presses a barrage of arguments against the Plaintiffs' Complaints in both *Gruberg I* and *Gruberg II*. At bottom, however, four principal legal issues, three of which involve substantial questions of first impression under the Cable Act, govern the resolution of these motions. The three issues of first impression concern: (1) the statute of limitations applicable to actions under § 612(d); (2) whether the continuing violation theory applies to "overcharge" claims brought pursuant to § 612(d); (3) whether federal actions under § 612(d) are subject to dismissal under the doctrine of res judicata because of the entry of a final judgment in an earlier FCC proceeding. The fourth principal issue concerns the impact of an appeal of the FCC's most recent pricing formula for leased-access rates, which appeal currently is pending before the Court of Appeals for the District of Columbia. *See infra* Part II.D (discussing *ValueVision Int'l, Inc. v. FCC,* App. No. 97–1138 (D.C.Cir.)). Each issue is considered below.

### A. *Legal Standard*

Summary judgment is appropriate when, viewing the evidence in a light most favorable to the non-moving party, there is no genuine issue of material fact. *Brown v. City of Oneonta,* 106 F.3d 1125, 1130 (2d Cir.1997). This device is a "drastic procedural weapon because 'its prophylactic function, when exercised, cuts off a party's right to present his case to the jury,' " and thus the

---

**18.** In contrast, the "Wherefore Clause" in *Gruberg I* does not, technically speaking, seek a refund of any overcharges on the Northern Manhattan system, although the Plaintiffs have alleged that the prices Time Warner charges Gruberg for carriage on the Northern system are "unreasonable within the contemplation" of § 612(d) of the Cable Act. (*See Gruberg I* Compl. ¶ 55.)

The eight other such "terms and conditions" challenged by Gruberg in both Complaints concern Time Warner's allegedly unreasonable inclusion of contract clauses pertaining to: (1) non-liability for breach; (2) compelled renegotiation; (3) rejection of videotapes; (4) program listings; (5) representations and warranties; (6) indemnification; (7) self-help termination; and (8) relocation of programming. (*See Gruberg I* Compl. ¶ 60, at 22–27; *Gruberg II* Compl. ¶ 20, at 7–11.)

Court must apply the aforementioned standard to all evidentiary facts, regardless of whether such facts are ascertained directly or inferentially. *Garza v. Marine Trans. Lines, Inc.*, 861 F.2d 23, 26 (2d Cir.1988) (citation omitted).

To defeat the motion, however, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, the non-moving party must point to evidence sufficient to establish each element of its claims. The question of whether appropriate discovery has been undertaken is, of course, always a relevant consideration; a party should never be "railroaded" by a premature motion. *Cramer v. Devon Group, Inc.*, 774 F.Supp. 176, 180 (S.D.N.Y.1991); *see* 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* §§ 2727, 2741 (2d ed. & Supp.1997) (collecting cases). Moreover:

> The very nature of a controversy may render summary judgment inadvisable.... Summary procedures are especially salutary where issues are clear-cut and simple, but should not be based upon indefinite factual foundations involving a welter of statutory or regulatory provisions the application of which may depend on undeveloped facts.

*See McWhirter Distrib. Co. v. Texaco Inc.*, 668 F.2d 511, 519 (Em.App.1981) (citing *Kennedy v. Silas Mason Co.*, 334 U.S. 249, 256–57, 68 S.Ct. 1031, 92 L.Ed. 1347 (1948)).

### B. *Statute of Limitations*

The Defendant argues that the Plaintiffs' § 612(d) claims in *Gruberg II* are barred *entirely* under the doctrine of the statute of limitations. We disagree and instead hold that the "continuing wrong" doctrine permits the Plaintiffs to assert claims involving violations that occurred after January 31, 1994.

### 1. *Applicable Statute*

The Cable Act does not contain an express statute of limitations governing actions under § 612(d). Recent history teaches, however, that this is not an entirely unexpected phenomenon. *See, e.g., North Star Steel Co. v. Thomas*, 515 U.S. 29, 33–34, 115 S.Ct. 1927, 132 L.Ed.2d 27 (1995) (collecting cases); *Sandberg v..KPMG Peat Marwick, LLP*, 111 F.3d 331, 333 (2d Cir.1997). As one authority explained:

> Of the many gaps in the scheme of federal law, few have so vexed the federal judiciary as those that result when Congress creates a federal cause of action but fails to specify a period of limitations to govern the timeliness of the suit. Such congressional omissions have occurred with monotonous regularity and frequently confound the judicial branch ....

Abner J. Mikva & James E. Pfander, Essay, *On the Meaning of Congressional Silence: Using Federal Common Law to Fill the Gap in Congress's Residual Statute of Limitations*, 107 Yale L.J. 393, 393–94 (1997) (collecting statutes).

The general rule is that where, as here, the federal statute fails to provide any limitations period, courts look to the state statute " 'most closely analogous' " to the federal act in need. *North Star*, 515 U.S. at 29, 115 S.Ct. 1927 (quoting *Reed v. United Transp. Union*, 488 U.S. 319, 323, 109 S.Ct. 621, 102 L.Ed.2d 665 (1989)). This requires the court to "characterize the essence" of the asserted claim. *Wilson v. Garcia*, 471 U.S. 261, 267–70, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985).[19] The limitations inquiry here is a "pure question of law"[20] that has not previously been answered by a federal court. In this action, New York is the forum state and thus its law defines the applicable period. *See, e.g., Sandberg*, 111 F.3d at 333 (citing *Ceres Partners v. GEL Assocs.*, 918 F.2d 349, 353 (2d Cir.1990)).

**19.** *Cf.* David D. Siegel, *New York Practice*, § 37, at 4 (2d ed. Supp.1997) (discussing applicable statute of limitations where multiple theories are asserted by the plaintiff, and citing seminal case of *Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 639 N.Y.S.2d 250, 662 N.E.2d 730 (1995)).

**20.** *See, e.g., Sinclair Oil Corp. v. Atlantic Richfield Co.*, 720 F.Supp. 894, 896 (D.Utah 1989).

The parties present the Court with three principal options. The first option, advanced by Time Warner, is for the Court to find that the Plaintiffs' *price* claims are governed by N.Y. C.P.L.R. § 215(6), the one-year statute of limitations governing actions for "interest overcharge," while the *non-price* claims are governed by N.Y. C.P.L.R. § 214(2), the three-year statute of limitations governing actions "to recover upon a liability, penalty or forfeiture created or imposed by statute." (*See, e.g.,* Def.'s Mem. at 46–51; Tr. of 1/8/98, at 36.) The second option, advanced in the alternative by Time Warner, is that N.Y. C.P.L.R. § 214(2) governs *both* the price *and* non-price claims of the Plaintiffs. The third option, put forth by Gruberg, is that N.Y. C.P.L.R. § 213(1), the six-year "Omnibus Statute of Limitations," provides the appropriate limitations period for all claims, both price and non-price, under § 612(d). (*See* Pls.' Mem. Summ. J. at 40–46.)

■ At the outset, the Court rejects the proposed applicability of N.Y. C.P.L.R. § 215(6) to the Plaintiffs' price claims, which concededly are styled as claims for "overcharge[s]." (*See, e.g., Gruberg I* Compl. at 12 ("Wherefore Clause").) That statutory provision concerns an action "to recover any overcharge *of interest* or to enforce a penalty for such overcharge." *Id.* (emphasis added). The relevant practice commentary reads, in total, as follows: "This subdivision applies to usurious loans." Joseph M. McLaughlin, Practice Commentaries, *Action for Interest Overcharge*, 7B N.Y. C.P.L.R. § C215(6), at 646 (McKinney 1990). *But cf. Rubin v. City Nat'l Bank & Trust Co.,* 131 A.D.2d 150, 520 N.Y.S.2d 640, 642 (1987) (finding that plain language of § 215(6) extends to actions for "overcharge of interest" beyond mere "usury," the latter term, of course, being one of art). Although Time Warner's contention—that "[i]n the search for an analogous statute of limitations there does not have to be perfect symmetry," (Def.'s Reply Mem. Supp. Mot. Summ. J. ("Def.'s Reply Mem.") at 15)—is not entirely without force, we agree with the Plaintiffs' basic assessment that "[i]f *anything* is clear and easy about this litiga-

tion," it is that the § 612(d) "reasonableness" cause of action, even insofar as it concerns only price claims, bears little resemblance to an action for the overcharge of interest. (Pls.' Mem. Summ. J. at 44 (emphasis in original).)

The question of whether N.Y. C.P.L.R. § 214(2) or § 213(1) applies is less clear. The main difficulty is that the express terms of *both* statutes appear at first glance to apply to § 612(d) actions. For instance, § 214(2) imposes a three-year period of limitations in an action to recover on a liability "created or imposed" by statute. "Literally read, this would impose a three-year statute of limitations any time there was a statute defining liability, even when a statute merely codified an ancient common-law liability." Joseph M. McLaughlin, Practice Commentaries, *Action Upon a Statute*, 7B N.Y. C.P.L.R. § C214(2), at 521 (McKinney 1990). Section 213(1), on the other hand, is the six-year "catch-all" [21] statute that applies to "an action for which no limitation is prescribed by law." Given the aforementioned congressional silence, it is understandable that a litigant might believe that § 213(1) controls.

■ Fortunately, there is guidance. With respect to § 214(2), the New York Court of Appeals "has refused to give the [provision] so expansive a reading" as to make it applicable to all statutes—*regardless of whether such statutes merely codify actions traditionally available at common law.* Accordingly, "[t]he three-year period of limitations applies only when a statute creates a new liability that did not exist at common law and would not exist but for the statute." McLaughlin, *supra,* § C214(2), at 521 (citing cases). This gloss on the statute, we find, provides the basis for ruling that N.Y. C.P.L.R. § 214(2) governs the limitations period for § 612(d) claims.

There is little dispute that § 612(d) creates new liability that did not exist at common law and would, moreover, not exist but for the statute. As a general matter, the Cable Act is "landmark legislation" that "subjects the

---

**21.** The New York Court of Appeals also refers, somewhat more colorfully, to § 213(1) as the "cow-catcher" six-year statute of limitations. *See Vigilant Ins. Co. v. Housing Auth.,* 87 N.Y.2d 36, 637 N.Y.S.2d 342, 660 N.E.2d 1121, 1124 (1995) (Bellacosa, J.).

cable television industry to extensive and unprecedented federal regulation." *Daniels Cablevision, Inc. v. United States,* 835 F.Supp. 1, 2–3 (D.D.C.1993). Indeed, as this Court noted previously:

> Prior to 1984, the cable television industry had been governed by a patchwork of federal, state and local regulations. Congress passed the Cable Act to establish a national policy governing the cable industry and to establish the primacy of federal regulation of cable [television].

*Media Ranch,* 757 F.Supp. at 313.

Accordingly, the Court finds persuasive Time Warner's basic contention here—that § 612(d) is "a uniquely [f]ederal statute that creates uniquely [f]ederal obligations and rights." (Def.'s Mem. at 50.) The leased access provisions are indeed "a creature of federal statute" and absent those provisions, Time Warner would indeed have "no obligations" concerning the terms and conditions for leased access use asserted herein. (Def.'s Reply Mem. at 16–17.) Thus, the Court rules that N.Y. C.P.L.R. § 214(2) provides the appropriate limitations period for actions—concerning both price and non-price claims—under § 612(d).[22]

The Court notes Gruberg's attempts to characterize the § 612(d) action as "equitable" in nature, and thus create an entitlement to the more generous limitations period available under N.Y. C.P.L.R. § 213(1). (*See* Pls.' Mem. Summ. J. at 42–44.) That effort, while not entirely without merit, is ultimately unavailing. *See* Vincent C. Alexander, Supplementary Practice Commentaries, *Action Upon a Statute,* N.Y. C.P.L.R. § C214:2, at 135 (1994 Supp.) (citing *Solnick v. Whalen,* 49 N.Y.2d 224, 425 N.Y.S.2d 68, 401 N.E.2d

190, 193–95 (1980), and effectively downplaying significance of rubrics "equitable," "declaratory" and "legal"). Indeed, the three-year limitations period under § 214(2) "has been consistently applied to actions seeking equitable relief." *Hartnett v. New York City Transit Auth.,* 200 A.D.2d 27, 612 N.Y.S.2d 613, 614–16 (1994) (*Hartnett I* ) (collecting seven illustrative cases).

The Court's holding merits mention of a related, but analytically distinct concern about the appropriate limitations period. That concern is the "fundamental question" of whether the Court should parse out the various grievances that may be alleged under § 612(d),[23] assigning to each a distinct statute of limitations, or rather apply a single uniform period to all § 612(d) claims. Having reviewed carefully the relevant case law, the Court concludes that one uniform period should apply to all claims under § 612(d)—"if only in the interest of simplicity." *Sandberg,* 111 F.3d at 334; *see also Wilson,* 471 U.S. at 275, 105 S.Ct. 1938 (applying one limitations period to all claims under 42 U.S.C. § 1983, having concluded that "[t]he federal interests in uniformity, certainty, and the minimization of unnecessary litigation all support the conclusion that Congress favored this simple approach"). Accordingly, N.Y. C.P.L.R. § 214(2) governs all limitations questions under § 612(d), and any argument to the contrary is rejected.[24]

## 2. *Accrual Date*

The "dispositive fulcrum" of *Gruberg II* thus becomes the accrual date. *Vigilant,* 637 N.Y.S.2d at 345, 660 N.E.2d 1121. The specific question is whether the accrual date is

---

**22.** *See, e.g., Cullen v. Margiotta,* 811 F.2d 698, 718 (2d Cir.) (holding that Civil RICO actions are governed by § 214(2) after finding that "Congress intended in RICO to establish new prohibitions, enhanced sanctions, and new remedies; its goal was to eradicate organized crime, rather than simply to provide an avenue of redress for wrongs cognizable at common law"), *cert. denied sub nom. Nassau County Republican Comm. v. Cullen,* 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987); *Moll v. U.S. Life Title Ins. Co.,* 654 F.Supp. 1012, 1026 (S.D.N.Y.1987) (same); *Aetna Life & Cas. Co. v. Nelson,* 67 N.Y.2d 169, 501 N.Y.S.2d 313, 492 N.E.2d 386, 388 (1986).

**23.** *See* 47 U.S.C. § 532(d) (granting federal courts, *inter alia,* broad powers to award injunctive relief and actual damages).

**24.** (*See, e.g.,* Def.'s Reply Mem. at 16.). *But cf.* Eunice A. Eichelberger, Annotation, *Construction and Application of Communications Act Statute of Limitations (47 U.S.C.A. § 415(b)) Relating to Recovery from Carrier of Damages Not Based on Overcharges,* 81 A.L.R. Fed. 700 (1987 & 1997 Supp.).

at the latest August 1992, as the Defendant contends, or whether the "continuing violation" doctrine preserves Gruberg's claims, as the Plaintiffs submit.[25] On the unique facts of *Gruberg II*, we find persuasive the Plaintiffs' position.

■■■■ Federal law governs the question of accrual, even where, as here, a state statute of limitations is to be applied. *E.g., Cullen,* 811 F.2d at 725. The general rule is that a claim accrues when a plaintiffs " 'knows or has reason to know' " of the injury that is the basis of the action. *Id.* (citation omitted).

■■■ The factual predicates relevant to the accrual question are complex, although the following is a general outline set forth by the Defendant:

> Between 1990 and 1992, Gruberg executed three separate part-time leased access contracts for carriage on Channel 35 on the Southern Manhattan system. The first contract was executed as of October 31, 1990; the second was executed as of August 8, 1991; and the third was executed as of August 13, 1992. Each contract provided for carriage on [Time Warner's] Southern system for a term of approximately one year....
>
> ....
>
> The third and last contract executed by Gruberg expired on August 11, 1993. Since that date, Gruberg has not signed a new leased access contract for part-time carriage on the Southern Manhattan System....
>
> Even though Gruberg has not signed a new leased access contract, [Time Warner] has continued to carry Gruberg's programming on its Southern Manhattan system under the terms of the expired 1992 contract. [Time Warner] has continued to

charge Gruberg the same or lower part-time leased-access rates than those specified in the 1992 contract. Thus, Gruberg's rates for carriage on the Southern Manhattan system and the terms and conditions for such carriage have not materially changed since August 13, 1992.

(Def.'s Mem. at 18–19 (citations omitted).)

On the basis of these facts, the Defendant argues that the accrual date of Gruberg's claims is, at the latest, August 1992. In support of its claims, Time Warner cites a line of cases involving "overcharge" claims under the Economic Stabilization Act of 1970 and the Emergency Petroleum Allocation Act of 1973,[26] which cases purportedly demonstrate the principle that " 'the statute of limitations begins to run from the date of the first overcharge.' " (*See* Def.'s Mem. at 47–48 (quoting *USA Rookwood Corp. v. Atlantic Richfield Co.,* 888 F.2d 846, 848 (Em.App.1989), among other cases).) Time Warner further points out that, although Gruberg argues briefly that the doctrine of continuing wrongs applies here—even if the Court were to reject, as it has done, the Plaintiffs' argument that N.Y. C.P.L.R. § 213(1) supplies the relevant limitations period—Gruberg has not cited any case law to support his contention that the doctrine of continuing wrongs has any vitality in this context. (*See* Def.'s Reply Mem. at 17 n. 16; Pls.' Mem. Summ. J. at 45 n. 10).[27]

The Defendant's contentions are formidable, except that they do not address adequately one key concept in the aforesaid line of cases whose teachings Time Warner encourages the Court to adopt. That concept is the distinction between a "plain overcharge" claim, such as that present in *Martin Oil Serv., Inc. v. Koch Refining Co.,* 718 F.Supp. 1334, 1356–1359 (N.D.Ill.1989), and

---

**25.** The essence of the continuing wrong doctrine is that each periodic violation gives rise to a separate cause of action. Under this doctrine, the three-year statute of limitations would bar recovery of only those violations that occurred more than three years prior to the filing of the Complaint in *Gruberg II.See, e.g., Western Mountain Oil, Inc. v. Gulf Oil Corp.,* 726 F.2d 765, 767 (Em.App.1983). The Defendant has noted this matter. (*See* Def.'s Mem. at 48 n. 38.)

**26.** *See generally* 12 U.S.C. § 1904 note (1976); 15 U.S.C. §§ 751–60 (1976). The Court notes that the analogy between the context of leased access, and that of petroleum sales two decades ago, is obviously less than ideal.

**27.** Although the arguments of the parties focus on the issue of overcharge, the Court finds that the continuing wrong doctrine applies, for these purposes, with equal force to both the price and non-price claims.

an overcharge claim relating to a "decisive act" as to which all of the aggrieved party's injuries are attributable. As the *Martin* Court explained:

> We can either place [the plaintiff's overcharge] allegation within the scope of the continuing violation doctrine or we can consider its damages traceable to a single act committed by [the defendant] having occurred more than five years prior to the [plaintiff's filing of its federal suit, in which case the suit would be barred by the statute of limitations.]
>
> . . . .
>
> We . . . read *Johnson [Oil Co. v. United States Dep't of Energy,* 690 F.2d 191 (Em.App.1982) ] and its progeny as rejecting the continuing violation theory *only where the defendant commits a particular act to which the plaintiff's injuries are traceable, but preserving it with respect to "plain overcharge" cases.*

*Id.* at 1356–57 (collecting cases) (emphasis added). The *Martin* Court then went on to find that, under the particular facts present in that case, the concept of "plain overcharge" was applicable. It thus ruled that the continuing wrong theory preserved the plaintiff's overcharge claims insofar as they occurred within five years of the date of the filing of the Complaint, which period reflected the relevant statute of limitations, even though the first overcharge occurred more than seven years prior to the filing of the suit. *Id.; see also Western Mountain Oil, Inc. v. Gulf Oil Corp.,* 726 F.2d 765, 768 (Em.App.1983); *Go–Tane Serv. Stations, Inc. v. Clark Oil & Ref. Corp.,* 798 F.2d 481, 485 (Em.App.), *cert. denied,* 479 U.S. 1008, 107 S.Ct. 648, 93 L.Ed.2d 704 (1986).

Although Time Warner does not mention explicitly the "decisive act" doctrine, it does focus considerable energy on the date of August 13, 1992, (*see, e.g.,* Def.'s Mem. at 18, 46), which is, as discussed *supra,* the date on which Gruberg signed the last *written* contract with regard to the Southern system. Accordingly, the Court proceeds to examine whether that date, or any other, serves as the date of a "decisive act" as to which all of Gruberg's injuries are attributable. *See Martin,* 718 F.Supp. at 1358 (noting that "[i]n recognition of both the law of the case and of [the court's] view of *Johnson* and its progeny, [the defendant] attempt[ed] to find a decisive act" as to which all of the plaintiff's injuries could be traced).

Upon reflection, the Court finds that the facts, as they are currently developed, counsel against application of the "decisive act" doctrine. Although the Court accepts the Defendant's basic contention that Gruberg has been charged the same *or lower* rates since 1992, at least two countervailing factors are present. First, since 1990 four different pricing regimes[28] have governed Gruberg's use of leased access channels on the Southern system; especially notable is the fact that the FCC's *First Order* was not issued until 1993. *See, e.g., id.* at 1358 (noting fact that the pertinent regulation was subjected to eleven rulemakings between December 1974 and November 1980). Second, Time Warner has revised its leased access pricing structure, sometimes considerably, between 1990 and the present,[29] and thus this does not appear to be a case where a single, predominantly methodological act resulted in a uniform overcharging since the date of that act. *Id.* There instead exists the *possibility* that, although the Plaintiffs' rates have remained constant or even decreased through the years, Gruberg has overpaid in increasing amounts since the initial date of carriage. Simply put, the relevant facts, as well as the legality of the various regulations, are insufficiently crystallized at this point. *Cf. McWhirter,* 668 F.2d at 519; *Kennedy,* 334 U.S. at 256–57, 68 S.Ct. 1031. Accordingly, on the current record the Court rejects the

---

28. *See supra* Part I.A (explaining that under the Cable Act, operators were permitted to establish reasonable rates from 1984 until passage of the 1992 Cable Act and the regulations promulgated thereunder; the FCC's *First Order* governed leased access from April 1993 to early March 1996; the FCC's *Reconsideration Order* governed leased access from late March 1996 until early February 1997; and the FCC's *Second Order* has governed leased access from late February 1997 to the present time).

29. (*See, e.g.,* Def.'s Mem. at 19 n. 15 (noting that Time Warner lowered Gruberg's rate for the Saturday 4:00–4:30 a.m. slot from $100.00 to $37.50 in 1997); Grief Aff. ¶ 17; Berman Aff. Exs. E–K.)

notion that any single act taken by Time Warner was "decisive" as that term is understood in the line of cases that the Defendant urges the Court to regard as controlling, and thus the Court does not preclude the Plaintiffs' claims to the extent that they concern violations occurring since January 31, 1994.

### C. Res Judicata

The Defendant argues that the Plaintiffs' § 612(d) claims must be dismissed under the doctrine of res judicata. Specifically, in its first memorandum of law, Time Warner argues that Gruberg's claims concerning the Southern Manhattan system should be barred under that doctrine. (*See* Def.'s Mem. at 41–45.) Then, in its reply memorandum, Time Warner expands its argument to suggest that res judicata should also bar Gruberg's Northern claims. (Def.'s Reply Mem. at 11.) We disagree in both respects.

### 1. Legal Standard

■ In general, the policy in favor of repose underlying the application of res judicata to judicial decisions "applies with equal strength" to administrative decisions. 2 Kenneth Culp Davis & Richard J. Pierce, Jr., *Administrative Law Treatise* § 13.3, at 248 (3d ed.1994). As the Supreme Court stated, such repose is justified on the sound principle that "a losing litigant deserves no rematch after a defeat fairly suffered, in adversarial proceedings, on an issue identical in substance to the one he subsequently seeks to raise." *Astoria Fed. Sav. & Loan v. Solimino*, 501 U.S. 104, 107–08, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991); *see also Delamater v. Schweiker*, 721 F.2d 50, 53 (2d Cir.1983) (emphasizing need to avoid vexatious litigation).

The "clarity and simplicity" of the law of administrative res judicata is, however, "more apparent than real." Davis & Pierce, *supra*, § 13.3, at 248. To wit:

> Application of the [general] principles [of res judicata] often requires the courts to resolve difficult questions in three areas:

(1) What procedures are necessary to satisfy the predicate for application of res judicata that "the parties have had an adequate opportunity to litigate"? (2) What claim did the agency resolve? (3) When has Congress instructed the courts to apply, or not to apply, res judicata to agency adjudicatory decisions?

*Id.* Bearing these principles in mind, we turn to the specific claims in this litigation.

### 2. Northern System

■ The doctrine of res judicata does not preclude the Plaintiffs' claims in *Gruberg I*. As mentioned above, Gruberg's FCC Petition alleged overcharging on the Southern Manhattan system—not the Northern one. Accordingly, Gruberg's claims concerning the Northern system were never before the FCC. *See Gruberg*, 12 F.C.C.R. ¶¶ 1,11.

Time Warner presses for dismissal of *Gruberg I* on the basis that Gruberg's carriage on the Northern system arose out of the same series of transactions as his Southern claims. (Def.'s Reply Mem. at 12.) That is plainly not the case. Gruberg's carriage on the Southern system began in 1990, and the last written contract for carriage on that system was signed in 1992. The first contract for carriage on the Northern system was, however, not executed until September 9, 1996. Most importantly, different rates apply to carriage on the two systems. Indeed, Time Warner generates separate "rate cards" [30] for the Northern and Southern systems. (*See* Berman Aff. ¶ 19 n. 12 & Exs. E–K.) Thus, although the Plaintiffs' allegations with respect to the *non-price* terms and conditions for carriage on both systems are the same,[31] the significant questions concerning the legality of the price rates on the Southern system, on the one hand, and the legality of the rates on the Northern system, on the other hand, clearly possess different factual predicates.[32] Thus, the doctrine of res judicata does not bar the Plaintiffs' claims in *Gruberg I*.

---

**30.** These "rate cards" represent a weekly "snapshot" of the various leased access fees for any given hour of programming time. (Berman Aff. ¶ 20.)

**31.** *See supra* note 18.

**32.** As noted earlier, *Gruberg I* and *Gruberg II* were consolidated for purposes of discovery only.

### 3. Southern System

 The proposed application of res judicata to bar the claims in *Gruberg II* presents a closer call. Ultimately, however, we deny the Defendant's application on the basis of the relevant statutory language and the unique facts of this litigation.

As set forth at the outset of this Opinion,[33] the 1984 Cable Act provided only one forum, the federal district court, for resolution of leased access disputes. That original legislation granted the district court broad powers of relief, but did not provide for the administrative adjudication of such disputes. Matters changed, of course, in 1992 when Congress decided that the FCC should also be granted authority to address these controversies.

Never resolved by Congress, however, was the relationship, for purposes of res judicata, between the recently established administrative procedures and the § 612(d) actions available since 1984. In light of that vacuum,[34] the parties offer divergent interpretations. Time Warner encourages the Court to find that these fora are mutually exclusive—i.e., that an aggrieved party can pursue relief either through the FCC or through the district court, but in no event through both—and apply the doctrine of res judicata accordingly. (Def.'s Mem. at 45.) Gruberg, however, suggests a different approach: "In giving the FCC authority to establish procedures for the 'expedited resolution' of leased access complaints, [ ] Congress plainly intended to *supplement*—not *displace*—the recourse available to aggrieved programmers under § 612(d). To be sure, Congress agreed with the FCC that § 612(d) had proven to be a 'cumbersome' enforcement mechanism," but it "nonetheless left § 612(d) *completely intact* when it enacted § 612(c)(4)(A), thus providing aggrieved programmers the choice of pursuing a 'cumbersome' § 612(d) lawsuit, an 'expedited' proceeding at the FCC, or both." (Pls.' Mem. Summ. J. at 39 (emphasis in original).)

A complex body of law has evolved out of similar disputes, although the Cable Act is, quite evidently, a novel statute. *See* Davis & Pierce, *supra*, § 13.3 (collecting cases analyzing, *inter alia*, the principle that "[s]ince res judicata is a common law doctrine, its applicability and scope can be modified by statute"). *Compare Astoria*, 501 U.S. at 106, 111 S.Ct. 2166 (holding that judicially unreviewed findings of state administrative agency had no preclusive effect on ADEA suit in federal court), *and Texas Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1570 (Fed.Cir.1996) (ruling that factual determination by International Trade Commission did not have collateral estoppel effect in subsequent infringement action), *cert. denied,* —— U.S. ——, 117 S.Ct. 1818, 137 L.Ed.2d 1027 (1997), *and Dionne v. Mayor & City Council of Baltimore*, 40 F.3d 677, 681–82 (4th Cir.1994) (finding that unreviewed state administrative decision on substantive claim of illegal termination did not preclude subsequent § 1983 due process claim arising from employee's discharge), *with Misischia v. Pirie*, 60 F.3d 626, 628 (9th Cir.1995) (holding that § 1983 action was barred by res judicata because plaintiff did not seek state court judicial review of administrative decision denying dental license).

Even assuming *arguendo* that ordinary principles of res judicata apply here, the Court finds that one clear way for Gruberg to have preserved his § 612(d) claims would have been to withdraw, or request a stay of, the FCC Petition. *See Puerto Rico Maritime Shipping Authority v. FMC*, 75 F.3d 63, 69 (1st Cir.1996) (discussing that possibility in context of Federal Maritime Commission proceeding). In this regard, Plaintiffs' current counsel, Kenneth P. Norwick—who was not Gruberg's counsel at the time the FCC Petition was filed on April 27, 1995—sets forth certain relevant facts in his Affidavit submitted to the Court. To wit:

> I personally communicated with the FCC in March 1997 to advise it of the pendency of these [federal] cases and to

**33.** *See supra* Part I.A.

**34.** Indeed, at oral argument Time Warner's lead counsel, Stuart W. Gold, candidly acknowledged to the Court that "one of the reasons we have

this tussle is because [Congress] did not do anything" to § 1962(d) even as it was "fixing everything around [that subsection]." (Tr. of 1/8/98, at 16.)

request that it take no further action on the petition Gruberg filed with it, at least pending the outcome of these cases. More specifically, on March 25, 1997 I called Ronald Parver, Assistant Deputy Chief, Consumer Protection and Competition Division, Cable Services Bureau. In that conversation, I reported to him the pendency of these cases and discussed with him how Gruberg's pending FCC petition should be handled in light of the cases.

By letter to me dated March 27, 1997, a copy of which is annexed hereto as Exhibit "K," Mr. Parver acknowledged that telephone conversation and stated in part:

"I will call you at the end of this month regarding your client's position regarding pursuing the above-stated matter."

Mr. Parver did then call me as he said he would, and in that conversation I advised him that Gruberg wanted no further action taken on his FCC petition pending the outcome of his court cases. Mr. Parver responded that he agreed with that course of action and that it would be implemented. Deeming this entirely non-controversial procedural matter resolved, I did nothing [more] in furtherance of it—including writing a confirming letter to Mr. Parver.

About a month later, and in direct contravention of my agreement with Mr. Parver, I received a copy of the FCC's "Memorandum and Opinion" dated April 23, 1997 [and released two days later] adjudicating Gruberg's petition. In light of the weight Time Warner now attempts to place on that decision, I believe it is important that I now represent to and assure this Court that I explicitly and affirmatively undertook, a full month before that decision was rendered, to place in abeyance that petition pending the outcome of these cases, although it seems clear [now] that that effort did not succeed.

(Norwick Aff. ¶¶ 57–61 (para. symbols omitted) (quotations added).)

Considerations of fairness and equity should, of course, always inform the decision of whether to apply res judicata. Indeed, when applied in the administrative context that doctrine should not be "encrusted with the rigid finality" that marks its application in purely judicial proceedings. *Cf. Purter v. Heckler,* 771 F.2d 682, 691 (3d Cir.1985). Accordingly, on the unique circumstances present here, we find that the Plaintiffs have not had an adequate opportunity to litigate their grievances with respect to the Southern Manhattan system. Relevant factors include the regulatory quagmire that ensued the passage of the 1992 Cable Act; the limited nature of the proof considered by the FCC, (*see Gruberg,* 12 F.C.C.R. 4946, ¶¶ 1, 10); the meager, though not completely unsubstantial, procedural protections accorded Gruberg during the two-year pendency of the supposedly "expedited" FCC proceeding, (*see id.* ¶ 2 n. 2); Gruberg's efforts in good faith to stay the FCC proceeding; the fact that no adjudicative body has considered Gruberg's claim for damages, as opposed to overcharging; and the "first-impression" nature of this litigation. On balance, then, this particular totality of circumstances warrants denial of the Defendant's argument that res judicata should bar the § 1962(d) claims in *Gruberg II.*[35]

### D. *Further Stay of Proceedings*

The Plaintiff proposes that in light of the pending appeal in *ValueVision Int'l, Inc. v. FCC,* App. No. 97–1138 (D.C.Cir.), the Court should consider entering a stay with respect to the remaining "active" Causes of Action in both *Gruberg I* and *Gruberg II.* We find that proposition meritorious.

### 1. *Legal Standard*

▮ The district court possesses the inherent power to control its own docket and calendar. *Landis v. North Am. Co.,* 299 U.S. 248, 254–55, 57 S.Ct. 163, 81 L.Ed. 153 (1936). Thus:

A trial court may, with propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the

---

**35.** The Defendant's laches argument, which fails to allege adequate prejudice to Time Warner, is similarly denied. (*See, e.g.,* Def.'s Mem. at 51–52; Pls.' Mem. Summ. J. at 46.)

**438**

case. This rule applies whether the separate proceedings are judicial, administrative, or arbitral in character, and does not require that the issues in such proceedings are necessarily controlling of the action before the court.

*Leyva v. Certified Grocers of California, Ltd.,* 593 F.2d 857, 864 (9th Cir.), *cert. denied,* 444 U.S. 827, 100 S.Ct. 51, 62 L.Ed.2d 34 (1979); *see also Friarton Estates Corp. v. City of New York,* 681 F.2d 150, 160 (2d Cir.1982) (Friendly, J.) (discussing underlying doctrinal rationales).

### 2. *The ValueVision Appeal*

■ The legality of the FCC's new "implicit fee formula" is the central issue on appeal in *ValueVision.*[36] At present, that issue has not been the subject of a ruling by a federal court. Oral argument in *ValueVision* was scheduled for March 10, 1998, and the D.C. Court of Appeals has yet to issue a decision.

As discussed *supra,* the Plaintiffs' § 612(d) challenges in both *Gruberg I* and *Gruberg II* pertain to the "price, terms and conditions" of the Plaintiffs' leased access use. The *ValueVision* appeal, to be clear, concerns only the discrete issue of price, *i.e.,* whether the implicit fee formula promulgated by the FCC satisfies the mandates of the 1992 Cable Act. Accordingly, the Court acknowledges that it is conceivable, as least theoretically, for it to rule on the legality of the other "terms and conditions" of Gruberg's carriage while staying the issue of price.

Time Warner opposes vigorously any stay on these grounds. (*See* Tr. of 1/8/98, at 76–79.) The Court finds, however, that one of the Defendant's basic contentions, that this Court should effectively defer to the FCC's regulations and administrative decisions, requires us on these facts to consider *a fortiori* whether those regulations are consistent with Cable Act—if perhaps only to determine whether the FCC's interpretation constitutes a plausible construction of that statute.[37] Indeed, the Defendant cannot plausibly argue

here that "[t]he statutory scheme created by Congress ... supports the conclusion that [f]ederal courts must apply the FCC's regulations when deciding whether particular leased access terms and conditions are reasonable" without also arguing, as it does, that the regulations themselves are valid. (*See, e.g.,* Def.'s Mem. at 28.)

Moreover, the Plaintiff has not, in any sense, conceded the validity of the FCC's most recent regulations, especially those pertaining to price. For instance, Gruberg argues that:

> It is, of course, critically important for this Court to make its own findings on the reasonableness of Time Warner's part-time leased access rates since the FCC's "maximum reasonable rate" formula clearly disregards the intent of Congress "that the FCC use its authority to ensure that [leased access] channels are a genuine outlet for programmers." *Indeed, in developing its "maximum reasonable rate formula," the FCC has acted with indifference, if not outright hostility, towards Congress's goal of ensuring that leased access channels serve as "a genuine outlet for programmers."*

(Pl.'s Mem. Summ. J. at 21–22 (citations omitted) (emphasis added).) Accordingly, the precise question at issue in *ValueVision* bears directly on this litigation. *See Landis,* 299 U.S. at 255, 299 U.S. 248.

Considerations of judicial efficiency counsel in favor of staying the current proceedings with regard to both the price and nonprice allegations of Gruberg. We so find for several reasons. First, the parties here have not provided extensive briefing on the *ValueVision* question; consider, for instance, the fact that the only pertinent argumentation presented by Time Warner came at oral argument. (*See* Tr. of 1/8/98, at 76–79.) Second, while the Plaintiffs here request extraordinary relief in the nature of rate hearings—indeed, Gruberg seeks "a declaratory judgment setting forth reasonable terms and

---

**36.** Copies of the principal briefs in the *ValueVision* appeal were submitted as part of the record before this Court. (*See* Letter from Gold to Court of 1/26/98, ¶ 1.)

**37.** *Cf. Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

conditions to replace the unreasonable ones," (*Gruberg I* Compl. at 28)—the Petitioner in *ValueVision* has adopted a more realistic approach. Specifically, the Petitioner there has requested that the record of that case be remanded with instructions to the FCC to resolve the matter of generating a new formula, if necessary, within 120 days. (*See* Pet'r Br. at 38.) To wit:

> For all the reasons identified above, the FCC's decision in this case with respect to maximum leased access rates should be set aside as arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). Given the past history of these proceedings, the Court should expressly require the FCC to act promptly on remand. As Judge Posner held in a similar case, "[i]f administrative expertise means anything, it means that after an agency has been ruminating about a problem for two decades it can act swiftly to deal with the consequences of a judicial finding that its latest regulation of the problem is unlawful."

(*Id.* at 38 (quoting *Schurz Communications, Inc. v. FCC*, 982 F.2d 1043, 1056 (7th Cir. 1992).)) Presumably, the D.C. Court of Appeals will either uphold the new price regulation or order that the FCC establish a new one; either way, resolution of that appeal should guide this Court in ruling on one of the key issues in this litigation.

With regard to whether the Court should, as is theoretically possible, rule on the non-price terms of the contract, such an approach is unwise where, as here, the relevant individual contractual provisions were, at least to some extent, the subject of comprehensive negotiations and bargaining. *See, e.g., Arkwright–Boston Mfrs. Mut. Ins. Co. v. New York*, 762 F.2d 205, 210 (2d Cir.1985) (discussing policy of avoiding "piecemeal resolution" of litigation). Accordingly, the Court hereby stays both *Gruberg I* and *Gruberg II* in their entirety.

### III. CONCLUSION

In summary, the Court rules that: (1) all claims under § 612(d) of the Cable Act are governed by the three-year limitations period found in N.Y. C.P.L.R. § 214(2), which provision concerns liabilities "created or imposed" by statute; (2) on these facts the continuing violation theory preserves the Plaintiffs' § 612(d) claims on the Southern Manhattan system to the extent that such claims involve violations occurring since January 31, 1994; (3) the FCC's prior denial of Gruberg's petition for relief does not warrant the dismissal of the Plaintiffs' § 1962(d) claims under the doctrine of res judicata; and (4) efficiency considerations dictate that the surviving Causes of Action in both *Gruberg I* and *Gruberg II* should be stayed pending resolution of the *ValueVision* appeal currently before the Court of Appeals for the District of Columbia Circuit.

With the understanding that the parties have leave to refile discovery motions, as well as dispositive motions at the close of discovery, the Court will endorse all three pending motions as decided consistent with this Opinion. Both suits will be placed on the suspense docket, and the parties are hereby directed to contact the Court when further developments in the *ValueVision* appeal warrant reactivation of this litigation.

SO ORDERED.